Frederick Cains  FC-8083
Attorney for Plaintiff Roque De La Fuente
430 East 86th Street
New York, NY 10028
(212) 249-9920
Frederickcains@yahoo.com

# UNITED STATES DISTRICT COURT

## for the  Southern District of New York

----------------------------------------------------------x

Roque De La Fuente, an individual,

       Plaintiff,                               Case No. 17-cv-04759 (PAE)

       -against-

The Sherry Netherland, Inc., a corporation;        **Jury Trial Requested**
Howard M. Lorber, Michael J. Horvitz,
Wendy Carduner, Mary McInnis Boies,
Ira A. Lipman, Dr. Marjorie Fisher Furman,
Frederic M. Seegal, Arnold S. Gumowitz,
Edward L. Gardner, individually and as
Directors of the corporate Defendant;
and the shareholders/proprietary lessees and
residents of the building owned by the
corporate Defendant:
John Does 1-150
Jane Does 1-150
XYZ, Inc.
ABC, Ltd.

----------------------------------------------------------x

1

## SECOND AMENDED COMPLAINT FOR A CIVIL CASE

## I.    Introduction

1.      This is a stock story of a member of a minority racial and ethnic group trying to buy an apartment in a "white-glove" [1] Fifth Avenue cooperative apartment building owned by Defendant The Sherry Netherland, Inc. (Sherry), with 154 cooperative apartments exclusively owned by whites of western European ethnicities who discriminate against those of different races and national origins. The Sherry holds itself out as the finest full-service residence in Manhattan with twice daily maid service; 24 hour doormen, concierge, plain clothes security staff; and other amenities provided to cooperative unit residents.

2.      The gravamen of this case is intentional, arbitrary and malicious racial and ethnic discrimination against Plaintiff Roque De La Fuente (RDLF), a Mexican-American, and a "protected class" under applicable federal law.

3.      Defendant Directors, who are elected by the corporate Defendant's shareholders/proprietary lessees, determine Defendant Sherry's policies of disapproving would-be assignees of its proprietary leases and transferees of its shares of stock, are a "Who's Who" of the professional, business and social elite of New York City.

4.      Said Directors strive to exclude all but members of the white race, of western European ancestry, from living among them as apartment owners in the Sherry.

5.      Others, they apparently believe, would take away from the aura of "Our Crowd" that they believe makes their apartments especially valuable, and even the admission of one

---

[1]      All of the passenger elevators are manually operated by attendants wearing white linen gloves.

"undesirable" would create a sense of "there's goes the neighborhood" leading to tens if not hundreds of millions of dollars of losses of the collective market value of the 154 apartments.

6.      Said Directors firmly assert they have the lawful right, without being required to state a reason, to exclude anyone from purchasing an apartment in the Sherry.

7.      Plaintiff's claims are grounded in his assertion that the public policy of the United States and the public policies of New York state and New York City, as enunciated in their statutes, regulations and court decisions do not permit Defendants to bar Plaintiff from purchasing an apartment in the Sherry, as they have, solely because he is Mexican-American,

## II.      The Parties to This Complaint

**Plaintiff**:

1.      RDLF an individual residing on the commencement date of this proceeding at 70 West 45th Street, New York, NY 10036.  Telephone (917) 821-0808.

**Defendants**:

A. 1.      The Sherry, a New York corporation; and its Directors Howard M. Lorber, Michael J. Horvitz, Wendy Carduner, Mary McInnis Boies, Ira A. Lipman, Dr. Marjorie Fisher Furman, Frederic M. Seegal, Arnold S. Gumowitz, Edward L. Gardner, all individuals, are Directors of the Sherry and are named in that capacity and individually. All Defendants reside at 781 Fifth Avenue, New York, New York 10022.  Telephone 212 355-2800.

2.      These individual Defendants constitute the entire Board of Directors of the corporate defendant, and wholly dominate, operate and control all its business and financial affairs.

3.      They conspired personally to commit acts of racial and ethnic discrimination against RDLF, who they viewed as undesirable, by not entertaining his application to purchase an

apartment in the same manner as they generally treat applications from whites of western European origin.

5.      The market value of apartments in the Sherry varies from $500,000 for servant's quarters to over $65 million for full floor layouts.

6.      The shareholders elect Defendant Director who appoints officers of the corporation.

8.      The shareholders who are pleased with the status quo benefit from the Sherry's uniquely present in-house real estate brokers (the Sherry brokers) who list their apartments for sale and rentals and screen applicants to allow only whites of western European ethnicities to buy or rent apartments. The Sherry controls its in-house brokers.

9.      The shareholders have conspired with each other to elect Directors committed to keeping Mexican-Americans and other protected classes from purchasing apartments in the Sherry.

## III.      Basis for Jurisdiction

1.      In addition the amount in controversy exceeding $75,000, this is a federal question case arising under 28 U.S.C. § 1331 involving the following statutory authorities which prohibit discrimination on the basis of race or ethnicity for the purchasing of residential housing by members of a "protected class" including Mexican-Americans such as Plaintiff. Also following below are controlling statutes of the State and City of New York that must be applied by this Court under its supplemental jurisdiction if Plaintiff can state a Count under federal law.

## Federal statutes.

2.      42 USC § 1982. Refusal to sell property to willing buyer solely on the basis of race or national origin. *"All citizens of the United States shall have the same right, in every State and Territory, as is enjoyed by white citizens thereof to inherit, purchase, lease, sell, hold, and convey real and personal property."*

4

3.      42 U.S.C. § 2000a *et seq.* Claim injunctive relief for discrimination on the basis of national origin in a hotel, a public accommodation, selling lodging over the internet to transients from throughout the U. S. and the world.

4.      42 USC § 3601**.** It is the policy of the United States to provide, within constitutional limitations, for fair housing throughout the United States.

5.      42 U.S.C. § 3613(c)(1). Compensatory and actual damages for violation of rights under § 1982 or the Fair Housing Act. There is no limit for punitive damages.

6.      42 USC 3604(a). To refuse to sell or rent after the making of a  bona fide offer, or to refuse to negotiate for the sale or rental of, or otherwise make unavailable or deny, a dwelling to any person because of race, color, religion, sex, familial status, or national origin.

7.      Mexican-Americans, such as RDLF, are members of a **protected class** as determined by federal courts.

8.      New York State and New York City statutes and case law precedents prohibit racial and ethnic discrimination in housing and places of public accommodation.

9.      This Court has mandatory supplemental jurisdiction over state law claims when a claim based on federal law is stated in a complaint. 28 U.S.C. § 1367.

## New York State statutes

10.      New York Executive Law § 296 5(a)(2). To discriminate against any person because of race, creed, color, national origin, sexual orientation, military status, sex, age, disability, marital status, or familial status in the terms, conditions or privileges of the sale, rental or lease of any such housing accommodation or in the furnishing of facilities or services in connection therewith.

## New York City Statutes

11.      N. Y. C. Administrative Code § 8-107 4, 5. Public accommodations. a. It shall be an unlawful discriminatory practice for any person, being the owner, lessee, proprietor, manager, superintendent, agent or employee of any place or  provider of public accommodation, because of

5

the actual or perceived race, creed, color, national origin, age, gender, disability, marital status, partnership status, sexual orientation or alienage or citizenship status of any person, directly or indirectly, to refuse, withhold from or deny to such person any of the accommodations, advantages, facilities or privileges thereof,

12.   <u>New York Civil Rights Law</u> § 19–a. No corporation formed for the purpose of the cooperative ownership of real estate within the state shall withhold its consent to the sale or proposed sale of certificates of stock or other evidence of ownership of an interest in such corporation because of the race, creed, national origin, or sex of the purchaser.

> 2. For the purposes of this section a "corporation" shall include the cooperative management, cooperative tenants, cooperative shareholders, or any appointee or successor in interest of a corporation.

## IV.    Jury trial

1.      Plaintiff seeks a jury trial under the Seventh Amendment of all claims that are proper for a jury to decide.

## V.    Relevant Factual Background about RDLF

1.      RDLF was born in San Diego, California to parents whose father was born in Tuxpam, Veracruz, Mexico and mother in Monterrey, Nuevo Leon, Mexico.

2.      RDLF was prepared financially in December 2016 to purchase Unit 1211 in the Sherry for $1,275,000 in cash at a sale under § 363(b)(1) of Title 11 of the U. S Code held in the bankruptcy court in the S. D. N. Y.

3.      RDLF stated in the transcript of the sale hearing on December 20, 2016, that he had a personal net worth in 8 figures. He stated that he owns businesses in 10 states of the United States, and in 4 other countries. These, he explained, provide him with a regular and sizeable monthly income that is far more than sufficient to pay the monthly maintenance cost of the apartment he sought to purchase.

4.      RDLF has put substantial properties in trusts (RDLFT) for his 5 children.

5.      RDLF and RDLFT own and have owned real estate holdings in New York for over 20 years and are current as to all taxes related to these holdings.

6.      RDLF has never been convicted of a felony or misdemeanor and has never been fined by a government agency or court for any of his business dealings or personal conduct. He was censured 27 years ago by an administrative law judge for the lending policies of bank of which he was its president.  All loans were repaid in full; no money was lost by anyone; and the bank's shareholders profited from the interest paid.

7.      RDLF has never filed for bankruptcy.

8.      RDLF was an anomalous buyer of the Sherry apartment in that his application was submitted through the Chapter 7 Trustee to purchase the shareholder/proprietary lease for Unit 1211 because the Court determined by Order that he made the highest and best offer at a sale held under 11 U. S. C. § 363(b).  There was no real estate broker involvement in the transaction until after he entered into the sales contract and was rejected by Defendant Directors.

9.      RDLF did not learn about the availability of the apartment for purchase through any advertisement or broker but only through the Debtor who had a self-interest,  and a statutory right and duty to find buyers to maximize her estate.

10.     When RDLF appeared at a bankruptcy court hearing on December 20, 2016, a bid contract for $1,100,000 had already been entered into the by Chapter 7 Trustee as seller, and buyers provided by the Sherry brokers.  The buyers were a white western European husband and wife residing in Monaco. The purpose of the hearing was for the Trustee to convince the Court to Order the bid contract to become a sales contract.

11.     RDLF made a higher offer, all cash and with an immediate closing, which was the highest and best offer. The Trustee furnished RDLF with a bid contract requiring a $100,000 cash deposit to be timely made.  RDLF, by his authorized agent, both signed the contract and made the deposit timely on or before December 23, 2016.

7

12.    The Court scheduled a hearing on January 4, 2017 prior to which the original bidders would be given the opportunity to increase his bid, which they did.  Ultimately, RDLF made the highest bid of $1,275,000 and a sale contract was ordered requiring RDLF to undergo the application procedure that the Sherry's attorney claimed was the Sherry's contractual right to impose.  The backup bidder was asked to do the same.  It was explained to both of them that to be considered their packages would need to be timely submitted and that each would be required to appear personally for an interview with the Defendant Directors.

13.    RDLF, in compliance, submitted timely and within a few days thereafter, in anticipation of the So-ordering of a sales contract, a complete package including an accountant's financial statements, social reference letters, private club membership details, and several magazines in which his photo appeared on the cover of one. The follow-on pages explained his background as a Mexican-American real estate developer. The focus of the story was his ownership of a 25,000 square foot *rotating* penthouse, the largest of its kind in the world, in Puente del Este, Uruguay, which is a resort destination for residents of Buenos Aires, Argentina.

14.    The Chapter 7 Trustee informed RDLF on or about January 12, 2017 that he was rejected by the Sherry. This was before the Sale Order authorizing the Sherry to consider the application of RDLF was signed and entered.

15.    The Sherry jumped the gun in rejecting RDLF.  To use a metaphor, the refusal to approve him as a lessee and transferee was before he was even in the starting gate.

16.    No written explanation was given for the rejection nor did Defendants inform RDLF of any deficiency that he may be able to correct so that he could reapply.

17.    RDLF subsequently learned that as a matter of federal and New York law the Sherry has no right of approval of a buyer in an involuntary sale of its proprietary lease and shares and that its posturing to the contrary was a ruse and misrepresentation of law to keep RDLF out.

8

18.     A federal statute. 11 U. S. C. § 365(f)(1),  nullifies all anti-assignment clauses in leases offered in a sale under 11 U. S. C. § 363.

19.     New York has a categorical public policy that corporations, notwithstanding any shareholders' agreement to the contrary, have no enforceable right to approve a transferee of its shares in an **involuntary** judicial sale other than the right to match the amount offered, but only if this right appears in the shareholders' agreement itself.

20.     The Sherry did not have, regarding Unit 1211, the contractual right or obligation to match an offer made at a bankruptcy sale or a sale by any other means, voluntary or involuntary.

21.     Subsequent to the rejection of RDLF who had bid $1,275,000 for Unit 1211, Defendant Directors authorized the Sherry to purchase Unit 1211 on behalf of Defendant Sherry for $990,000 on the condition that their offer not be subject to higher and better offers.

22.     Defendants therefore are enjoying a direct financial benefit from rejecting RDLF.

23.     By exercising its non-existent right to reject RDLF at a bankruptcy sale, the Sherry earned a windfall of $285,000 that being the difference between what RDLF contracted to pay and what the Sherry contracted to pay.

24.     At the subsequent hearing to accept the Sherry's bid of $990,000, a third party bid of $1,100,000 in cash was made on the record.

25.     The Trustee refused to consider the bid recognizing the futility of accepting higher and better offers only to have the buyers refused a lease by the Sherry.

26.     The rejection resulted in less money being available to pay creditors and a surplus to the Debtor.

27.     The effect of his rejection by the Sherry has been devastating to RDLF, who registered with the New York City Campaign Finance Board in April 2017 as a candidate for Mayor of New York City in the 2017 election.

9

28.     The lack of a residence in New York City prevented RDLF from registering with the New York City Board of Election and the New York City Campaign Board in January 2017 and beginning his campaign immediately thereby causing him to miss out on 2 public debates.

29.     The degradation of being rejected on racial and ethnic grounds has manifested itself in physical ailments such as sleeplessness and headaches and consequential depression because of the intentional infliction of emotional distress upon RDLF by Defendants the Sherry and its Directors solely because of RDLF's race and ethnicity as a Mexican-American.

.

## VI.     Relevant information about Defendant the Sherry

1.     The Sherry operates on its premises at 781 Fifth Avenue in Manhattan a deluxe hotel, restaurant, and shops; all patronized by customers from all over the U. S. and the world.

2.     In the course of providing services and products, the Sherry engages in interstate commerce by making purchases from residents of states other than New York.

3.     All businesses operated by the Sherry therefore are public accommodations as defined by controlling federal and New York State and City law.

4.     Revenues from the public flow into the Sherry's income statement and tax returns in the same manner as maintenance paid by the proprietary lessees of co-op apartments including Unit 1211.

5.     The Sherry's food and beverage concessionaire, Cipriani's, operates a restaurant within the the Sherry-owned building that serves breakfast, lunch, afternoon tea, dinner and supper to the public as well as providing room service to the residents of the Sherry.  This automatically brings the entire facility within the ambit of Title II. (Civil Rights Act).

6.     The majority of those purchasing a cooperative apartment in the Sherry do so through a Sherry broker.

7.     Only those who are pre-cleared by the Sherry brokers are allowed to complete the application process that includes the submission of financial statements, social references and a personal interview with the Defendant Directors.

8.     Members of minority groups who are screened by the Sherry brokers have been discouraged by them from undergoing the application process by being told falsely there are no apartments currently available or those that are open for purchase are under contract.

9.     Thus while pre-qualification by the Sherry brokers is an outwardly neutral process, in practice it results in the submission of the vast majority of applications from members of the white race of western European ethnic backgrounds.

10.    Defendant Director Howard M. Lorber (Lorber) is the Chief Executive Officer of Douglas Eliman, Inc. a real estate brokerage company with upon information and belief 4,000 licensed broker salespeople and $25 billion in annual revenues.

11.    Lorber is an expert on the residential marketplace for co-ops in Manhattan and is aware that there is a clientele who embrace racial and ethnic discrimination in housing and who will pay a premium to reside in a building in which the apartments are owed exclusively by whites of western European ethnicities.

12.    Lorber holds himself out as a long term and very close personal friend of President Donald J. Trump (Trump/the President).

13.    The President has appointed Lorber Chairman of the National Holocaust Museum. Lorber's grandparents were Greek Jews.

14.    Following then candidate Trump's entry in June 2015 into the 2016 Presidential race, Lorber, according to a report in the Washington Post on August 10, 2016, organized receptions for Trump in the Hamptons and elsewhere and personally donated $100,000 to Trump's campaign fund.  Previously Lorber had appeared on Trump's television show, "The Apprentice."

11

15.    Lorber has vouchsafed for Trump in Moscow to members of the Russian government at the highest level, according to the pre-mentioned report in the Washington Post.

16.    When Trump announced his candidacy in June 2015, he said this about Mexicans who come to America:

> "When Mexico sends its people, they're not sending their best. They're not sending you. They're not sending you. They're sending people that have lots of problems, and they're bringing those problems with us. They're bringing drugs. They're bringing crime. They're rapists"

17.    Trump also added:

> "I would build a great wall, and nobody builds walls better than me, believe me, and I'll build them very inexpensively, I will build a great, great wall on our southern border. And I will have Mexico pay for that wall."

18.    Lorber at no time disavowed the preceding sentiments of Trump in any public statement and therefore may be deemed to agree with them.

19.    When the Defendant Directors of the Sherry, including Lorber, learned that RDLF, a Mexican-American, wanted to come and live among them, they became horrified and furious that an individual they viewed as racially and ethnically inferior to them, wanted to live in their midst.

20.    Defendants in their response to RDLF's First Amended complaint, dissembled by asserting that they had no knowledge that RDLF was a Mexican-American before rejecting him.

21.    This assertion was false and willfully and knowingly made to mislead this Court.

22.    Defendant Directors were well aware that RDLF was Mexican-American **before** rejecting his application.

    (a)    In its Memo of Law in support of its motion to dismiss the first amended complaint, reference is made to a published case in which RDLF was a party.  Dkt. 22, Def. Memo

of Law, p. 5 (P 13 of ECF).  In the same case appears a statement that the mother of RDLF was a housewife residing in Mexico City. <u>de la Fuente v. F.D.I.C.</u>, 332 F.3d 1208, 1215 (9th Cir. 2003)

      (b)    On December 20, 2016, RDLF and his 26 year old son, Ricardo, currently studying at the Harvard Business School, were in bankruptcy court where they negotiated with an attorney who appeared on the record for the Sherry, Gabriel Sasson (Sasson).  RDLF and Ricardo spoke in Spanish in the presence of Sasson.  Sasson knew that RDLF was a Mexican American and his knowledge, as an agent of the Sherry, must be imputed to its Board of Directors.

      (c)    On January 4, 2017, Sasson was also present as the transcript shows. The transcript also shows that RDLF had difficulty in pronouncing a certain word and was chastised by the Court for this shortcoming and asked to make repeated efforts to get it right.  RDLF, who appeared *pro se*, apologized and asked if he could make a re-statement using a substitute word that was easier for him to pronounce.

      (d)    If an attorney had represented RDLF, in view of the Court's criticism of his difficulties in speaking English, an interpreter would have been requested. Again, Sasson's knowledge is imputed to the Defendant Directors.

      (e)    The name "De La Fuente" has a unique meaning, appearing only in the Spanish language, namely  "of the fountain,".  It refers to families who lived in proximity to the ancient water supply for a community, a fountain.

      (f)    Furthermore, the English word fountain has very different translations in other European languages:

          German:      *Brunnen*

          French:      *Fontaine*

          Italian:      *Fontana*

| Portuguese | *Bebedouro* |
| Dutch | *Fontein* |

(g)     It is therefore unmistakable that the name De La Fuente is Spanish.   As already stated, the shareholders of the Sherry have western European ethnicities and are presumably familiar with the major European languages.

(h)     Because Spanish surnames are so readily differentiated, the Chief Judge of the E.D.N.Y.,  in a case treating with peremptory challenges of veniremembers based on their last names,  relied upon a U. S. Supreme Court holding that Mexican Americans are cognizable solely on the basis of their last names:

> See, e.g., Castaneda, 430 U.S. at 495, 97 S.Ct. at 1280 (Mexican–Americans are cognizable because "Spanish surnames are just as easily identifiable as race");

> United States v. Biaggi, 673 F. Supp. 96, 101 (E.D.N.Y. 1987), aff'd, 853 F.2d 89 (2d Cir. 1988) [Chief Judge Weinstein]

(i)     As the Sherry in their Memo of Law supporting its motion to dismiss reveals that it did case law research while considering RDLF's application, it is reasonable to believe that they also did internet research.   RDLF was a candidate for the U. S. Presidency in November 2016.   The Court is requested to take judicial notice of the Wikipedia reference disclosing that RDLF is a Mexican-American:

> "De La Fuente was born on October 10, 1954[2] at Mercy Hospital in San Diego, California, the son of Roque Antonio De La Fuente Alexander and Bertha Guerra Yzaguirre. **His parents raised him in Mexico (Mexico City, Tijuana, Baja California), and in the United States (San Diego, and Anaheim, California). He was educated by his parents and the Legionaries of Christ, the Marist Brothers, the Carmelite Sisters of the Most Sacred Heart, Daughters of the Holy Spirit and the Jesuits.** As a youth, De La Fuente attended Saint Catherine's Military Academy in Anaheim, California and then earned a B.S. in Physics and Mathematics from the Instituto

Patria <u>National Autonomous University of Mexico</u>, and studied Accounting & Business Administration at <u>Anahuac University</u> near Mexico City." [Emphasis added.]

<u>https://en.wikipedia.org/wiki/Rocky_De_La_Fuente</u>

23.   RDLF upon information and belief is the only Latino Mexican-American ever to submit an application to purchase an apartment in the Sherry because others, not trying to purchase an apartment through a bankruptcy sale, were "screened out" by the Sherry brokers.

24.   The bankruptcy court issued a Sale Order on January 13, 2017 naming RDLF the most qualified bidder, after which the Sherry was to consider the application of RDLF.  A copy of the Order was furnished to the Sherry's attorneys.

25.   Prior to the entry of the Order, however, the Trustee's attorney Scott Markowitz advised RDLF that he need not appear for the personal interview because the Sherry had rejected him out of hand. RDLF was disqualified before the get-go.

26.   This was also conveyed to him by Michael Ullman (Ullman), the chief operating officer of the Sherry, who met with RDLF at cocktail time in the bar in Cipriani's restaurant in the Sherry building in early January 2017.

27.    Ullman previously had been the general manager of the Valencia resort hotel in La Jolla, California, a few miles north of San Diego, where RDLF has lived and worked for most of his adult life.

28.   Ullman told RDLF he was well aware that RDLF was the largest landowner in San Diego and had operated 9 car dealerships simultaneously in San Diego County.

29.   Today RDLF still owns De La Fuente Cadillac located at 1385 E. Main Street, El Cajon, CA 92021, 1 of 2 Cadillac dealers within 20 miles of downtown San Diego.

30.   Because the dealership name is carried on license plate holders furnished by the dealership to its customers, there is general familiarity with the De La Fuente name among motorists throughout San Diego County.

31.   Ullman made it clear to RDLF on behalf of Defendants that "*his kind*" was not welcome to become the owner of a cooperative apartment at the Sherry but that as a member of the public he was free to stay in a cooperative apartment unit as a hotel guest and to receive the same 20% discount at Cipriani's offered to permanent residents.

32.   RDLF understood Ullman to mean that Mexican-Americans could never be "insiders" at the Sherry, but only "outsiders looking in" and that RDLF was the victim of this intentional and long-standing discrimination policy of the Defendant Directors.

33.   After being rejected, in January 2017, while staying at the Sherry, RDLF spoke with a Sherry broker, Theresa Nocerino (Nocerino), who had her office in the building, to see if he could "save" the situation by having his adult daughter become the shareholder and lessee of Unit 1211.

34.   Nocerino informed him that if she would post a "deposit" of approximately $500,000 to the general fund of the Sherry, the amount of 5 years' monthly maintenance and expected assessments on Unit 1211, that the Board may consider her more favorably than otherwise.

35.   Notably this would not relieve her from making timely monthly payments of maintenance and assessments.

36.    It was explained by Nocerino that the deposit would be a long-term interest free loan to the Sherry. RDLF refused.

37.   RDLF subsequently learned that this requirement was not made of white ethnically west European purchasers and that the only Asian owner of an apartment, Miles Kwok (Kwok), paid $3 million in a similar deposit arrangement in 2016 and was approved by the Board to purchase Unit 18 for $63 million.

38.     Kwok subsequently learned that this was an arrangement, *sui generis*, as to him but not to whites of western European origin.

39.     Kwok since has sued the Sherry for racial and ethnic discrimination.

40.     Kwok alleged in his suit that the Sherry used part of his $4 million to pay for repairs to the building that was not Kwok's obligation. This was without his knowledge or authorization.

## VII.    Relevant Procedural Background

1.     RDLF previously sought similar relief as being sought herein in a district court in the SDNY by attempting to remove a contested matter from a bankruptcy court in the SDNY. Thereafter Judge Chapman stated on the record on May 11, 2017 that RDLF was free to seek relief against Defendant Sherry in another court.

2.     After filing a withdrawal of reference in the District Court, Judge Schofield dismissed the case ruling that RDLF could only seek relief in the District Court by a plenary action.

3.     On December 20, 2016 RDLF was present in-person during a hearing held in the Bankruptcy Court of the Southern District of New York in an involuntary Chapter 7 case known under Case Number 05-10338(SCC).

4.     The hearing was short-noticed by the Chapter 7 Trustee in the said case.

5.     The purpose of the hearing was for the Court to determine whether a motion filed by the Trustee under FRBP 6004 and 11 USC § 363(b)(1) to evaluate if an offer from a third party, the initial bidder, of a $1,100,000 cash payment to purchase Apartment 1211 in a cooperative commercial building located at 781 Fifth Avenue, New York, New York 10021, that was owned by the estate of the Debtor, was a fair and reasonable offer pursuant to 11 USC § 363(b)(1).

6.     Notices of the motion were given by the Trustee to all parties-in-interest including the Debtor, as required by law

7.     The Debtor invited Plaintiff RDLF to bid for the apartment owned by her estate.

8.     After RDLF agreed to bid the Debtor filed a timely objection to the proposed sale and informed the Court that a third party would attend the hearing and bid.

9.     RDLF attended the hearing and participated *pro se.*

10.    RDLF made a *bona fide* initial offer of a $1,195,000 cash payment to purchase.

11.    RDLF and the Trustee signed a bid contract.

12.    RDLF was required to and did timely wire a $100,000 deposit to the Trustee under a term of said contract.

13.    A few days later, after the initial bidder overbid, RDLF increased his bid to $1,275,000 which was recommended by the Trustee and accepted by the Court as the high bid.

14.    The Sherry, by its attorneys attending the hearing on December 20th, misinformed the Court that no sale could be concluded by the estate to RDLF without its approval of RDLF who the Sherry demanded timely submit financial and other information about himself, known as a "Board Package" to the Trustee for forwarding to the Sherry.

15.    RDLF also had to agree to make himself available for a personal interview with the Board of Directors of the Sherry.

16.    It is undisputed that RDLF timely submitted a complete Board Package and was available for the said interview.

17.    The Board of the Sherry after receiving the Board Package, and without any personal interview, on or before the morning of January 13, 2017, which was before the entry of a Sale Order in the afternoon of January 13th, informed the Trustee that RDLF was unacceptable to them.

18.    No reason was given to the Trustee by the Sherry for their rejection of RDLF.

19.    The initial bidder refused to submit a complete Board Package, withdrew and was refunded his deposit.

20.     In law, any contractual right of the Sherry to approve the buyer of one its unit owner's lease at an involuntary judicial sale is voided by bankruptcy statute, 11 U.S.C. § 365(f)(1).

21.     A corporation's right to object to the judicial sale of its shares is contrary to the public policy of New York as this would limit the remedies of a judgment creditor by allowing a corporation to judgment-proof its shareholders by rejecting all who would buy his shares.

22.     Immediately thereafter the Trustee put the apartment back on the market with an asking price of $1,100,000.

23.     The $100,000 deposit of RDLF was not refunded.

24.     Most of RDLF's deposit has been paid to the Sherry by the Trustee.

## VIII.  Counts

*All causes of action are against the Sherry and its Directors in their official and individual capacities except for the last Count which is also against the individual shareholders/proprietary lessees and residents of the Sherry who conspired to elect Directors with a known bias and prejudice against Mexican Americans and other protected classes.*

### First Count

### Housing discrimination under the Fair Housing Act, 42 U.S.C. §3601 et seq.

1.     RDLF repeats and re-alleges all of the relevant factual allegations and citations to authorities set forth in §§ I. to VII. *supra* as if fully set forth herein.

2.     After RDLF entered into a contract to purchase Unit 1211 in the Sherry, and tendered a $100,000 cash deposit, Defendants denied a closing of the sale to RDLF solely because of his race and ethnicity in explicit violation of 42 USC 3604(a).  Defendant Directors individually participated in an intentional tort to deny RDLF the benefits of his contract with the Trustee that was subsequently approved by Order of the bankruptcy court. Defendants' acts in rejecting RDLF were intentional, arbitrary and malicious.

19

3.      RDLF seeks a declaratory judgment that with respect to an involuntary Chapter 7 sale in New York (or any involuntary judicial sale), no New York cooperative corporation has the right to object to the transferee of its shares as a matter of public policy; and, that under 11 U.S.C. § 365(f)(1) no lessor can object to the assignment of its lease with the Debtor as a sale conducted under 11 U.S.C. § 363(b)(1).

4.      RDLF seeks compensatory damages for Defendants' tortious interference with his contract with the Trustee to purchase Unit 1211 an for the intentional infliction of emotional distress to be proven at trial but no less than $5 million; plus exemplary and punitive damages.

## Second Count
### Housing discrimination under 42 U.S.C. § 1982 by reason of racial animus

5.      RDLF repeats and re-alleges all of the relevant allegations and citations to authorities set forth in §§ I. to VII. *supra* as if fully set forth herein.

6.      Defendants intentionally discriminate against Mexican-Americans and other minorities.  This policy has kept over 95% of the Sherry apartments owned exclusively by whites of western European ethnicities.

7.      The Sherry's in-house broker, headed by Nocerino, screens would be applicants and intentionally steers away Mexican-Americans and other protected classes such as blacks.

8.      RDLF, because he found out about the availability of the apartment from the Debtor, and entered into a sales contract through the bankruptcy court, Nocerino did not meet him until after he had signed the bid contract.

9.      After being refused a lease by the Defendants Directors, RDLF met with Nocerino to ask him his adult daughter could purchase Unit 1211.

10.     Nocerino stated that if the adult daughter of RDLF made a "security deposit" of 5 years maintenance and assessments, approximately $500,000 in cash, and agreed to pay the monthly invoices timely, the Board may consider her application favorably.

10.     Based on information and belief this request has never been made of white purchasers of western European ethnicities.

11.     Another member of a protected class, Kwok, in 2016, became the only Asian shareholder only after he made a deposit of approximately $4 million.  After learning that whites were not required to make such a deposit, Kwok sued for racial and ethnic discrimination. The Court is requested to take judicial notice of the facts alleged in Kwok's complaint filed in this Court under Index No. 16-CIV-06246.

12.     Finally RDLF was declined a personal interview with the Board, an action in the application process that is customarily granted to all white applicants of European ethnicities so that they may display their *bona fides* to best advantage. This declination is an action that indicates a clear intent to discriminate against RDLF.

13.     Defendants' acts in refusing a lease to RDLF were intentional, arbitrary and malicious.

14.     Based on false statements in the Sherry's Memo of Law in support of its motion to dismiss the First Amended Complaint, in which it is stated that Defendants had no idea that RDLF was a Mexican-American, it is transparent that the refusal to interview RDLF was a "head in the sand" tactic to establish a defense of being unaware of the race and ethnicity of RDLF.

15.     Said defense is puerile as the knowledge of an agent such as Sasson, who negotiated with RDLF before any application was made, is imputed to his principal, Defendants Sherry and its Directors.

16.     Because there are no Mexican-Americans who are shareholders in the Sherry, it is not possible to present statistical comparators to the general population of Mexican Americans using the standards methods of chi square and standard deviations from the mean.

17.     Courts have remarked, however, in similar circumstances, that an "inexorable zero" is a very important number when evaluating the presence of racial and ethnic discrimination.

18.     Defendant Directors individually participated in an intentional tort by depriving RDLF of the benefits of his contract with the Chapter 7 Trustee to purchase Unit 1211.

19.     RDLF seeks compensatory damages for the intentional infliction of emotional distress to be proven at trial but no less than $5 million; plus exemplary and punitive damages. 42 U.S.C. § 3613(c)(1).

### Third Count

**Denial of the rights of enjoyment of a public accommodation under 42 U.S.C. § 2000a et seq.**

18     RDLF repeats and re-alleges all of the relevant allegations and citations to authorities set forth in §§ I. to VII. *supra* as if fully set forth herein.

19.     The Sherry, unlike virtually every other co-op in Manhattan, is a for-profit corporation. Its shareholders/proprietary lessees make their furnished apartments available to the management of the Sherry to rent out as hotel rooms to transients. Revenues are shared as between the unit owners and Defendant Sherry. Hotel customers come from all over the U. S. and indeed the world using various internet websites to make reservations.

20.     The Sherry owns the building at 781 Fifth Avenue in Manhattan. Within the building are retail shops with sidewalk frontage; a restaurant, Cipriani's, which provides room service to residents and is open to the public; and a club, Doubles, which has a "velvet rope" policy in which its manager, Defendant Wendy Carduner, makes arbitrary and capricious decisions as to who she deigns to admit.

21.     It is U. S. Supreme Court precedent that if a business holds itself out as a public accommodation only in part, the entire business is a public accommodation. <u>Daniel</u>, 395 U.S. at 305, 89 S.Ct. at 1701.

22.     It is not lawfully possible for the Sherry to avoid being considered a public accommodation by segregating its businesses within the same building so that some are open to the general public and others are not.  It is an all or nothing proposition, once the camel's nose is inside the tent, it is a public accommodation.  This is especially so as the Sherry exists to earn a profit in all of its activities.

23.     Based on his personal observations made during multiple stays at the Sherry in late 2016 and early 2017, RDLF noted that during his use of the manned elevators, the floor corridors, and the lobby, at all hours of the day and night, that he saw no Mexican-Americans, blacks or Asians using these same facilities.  All users that he observed were of the white race.

24.     RDLF, although he was permitted to stay as a hotel guest and to purchase meals at Cipriani's, was not permitted to purchase Unit 1211 or enter Doubles to play backgammon, one of his favorite pastimes.

25.     A diligent search has revealed no current case law that permits a unitary business to deny access on racial or ethnic grounds to a portion of its facility while accepting purchases made in other portions by these same groups. "Jim Crow" laws have been outlawed by the Civil Rights Act of 1964.

26.     Defendant Directors individually participated in an intentional tort to deprive RDLF of the benefits of his contract with the Chapter 7 Trustee to purchase Unit 1211.

27.     RDLF seeks compensatory damages for the intentional infliction of emotional distress to be proven at trial but no less than $5 million; plus exemplary and punitive damages.

28.     RDLF seeks an Order enjoining the Sherry from reselling Unit 1211 to anyone without first providing RDLF with the right of last refusal for no more than the price paid by the Sherry.

**Fourth Count**

**Disparate *treatment* under the Fair Housing Act,  42 U.S.C. §3601 et seq.**

29.     RDLF repeats and re-alleges all of the relevant allegations and citations to authorities set forth in §§ I. to VII. *supra* as if fully set forth herein.

30.     After the Sherry rejected RDLF's purchase application that he had tendered with a $100,000 deposit, the Sherry instructed the Chapter 7 Trustee to use said deposit to pay the Debtor's maintenance to the Sherry and not to refund the deposit to RDLF.

31.     RDLF has been unable, after a diligent national search of case law, to find a single instance whereby the seller of a housing unit was able to retain the deposit of a buyer who had complied timely with all contractual requirements, and who was ready, willing and able to timely close, to keep the buyer's deposit because the seller arbitrarily and capriciously decided not to close.  This is a *per se* discriminatory act against a Mexican-American who appeared pro se in the bankruptcy court on December 20, 2016 and January 4, 2017.

32.     RDLF alleges that Sherry treated him thus solely because he is a Mexican American with the temerity (who does he think he is?) to want to live in the Sherry, and to serve as an example to other Mexican-Americans and other protected classes that trying to purchase an apartment in the Sherry is futile and could result in a considerable loss of their personal capital.

33.     Defendant Directors individually participated in an intentional tort to deprive RDLF of the benefits of his contract with the Chapter 7 Trustee to purchase Unit 1211.

34.     Defendants' acts in refusing a lease to RDLF were intentional, arbitrary and capricious.

35.     RDLF seeks a declaratory judgment that the Sherry must return his $100,000 deposit.

## **Fifth Count**

### **Disparate *impact* under the Fair Housing Act,  42 U.S.C. §3601 et seq.**

36.     RDLF repeats and re-alleges all of the relevant allegations and citations to authorities set forth in §§ I. to VII. *supra* as if fully set forth herein.

37.     The policy of the Sherry for approving applicants to purchase its apartments, while a facially neutral practice, has a significantly adverse and disproportionate impact on all Mexican-Americans, not only RDLF.

38.     Disparate impact can usually be proven statistically through standard deviation analysis and the chi square test.  When, however, the Mexican-American population of Sherry shareholders is zero, and there are 319,000 Mexican Americans residing in New York City, [2] a statistical analysis showing under-representation of Mexican-Americans in the Sherry therefore becomes unnecessary.  Zero out of 319,000 is a sufficient statistical statement to show racial and ethnic discrimination.

39.     RDLF also seeks a declaratory judgment that the requirement of the Sherry that all applicants  to purchase apartments, other than by involuntary sale, go through the Sherry brokers leads to disparate treatment of and impact upon minority members of protected classes.

40.     RDLF asks that this practice be enjoined and that interested sellers be limited to using third party licensed real estate brokers of their choice.

41.     <u>RDLF also seeks compensatory damages to be proven at trial but no less than $5 million; plus exemplary and punitive damages.</u>

_____

[2]   http://www.gothamgazette.com/index.php/government/5334-as-mexican-community-grows-local-leaders-eye-greater-political-prowess

### Sixth Count

### Violation of New York Executive Law § 296 5(a)(2).

42.     RDLF repeats and re-alleges all of the relevant allegations and citations to authorities set forth in §§ I. to VII. *supra* as if fully set forth herein.

43.     Defendants would not allow RDLF to close on his intended purchase of Unit 1211 in the Sherry.

44.     Defendant Directors individually participated in an intentional tort to deprive RDLF of the benefits of his contract with the Chapter 7 Trustee to purchase Unit 1211.

45.     Defendants acts in refusing a lease to RDLF were intentional, arbitrary and capricious.

46.     RDLF seeks compensatory damages for the intentional infliction of emotional distress to be proven at trial but no less than $5 million; plus exemplary and punitive damages.

### Seventh Count

### Violation of N. Y. C. Administrative Code § 8-107 4, 5. Public accommodations.

47.     RDLF repeats and re-alleges all of the relevant allegations and citations to authorities set forth in §§ I. to VII. *supra* as if fully set forth herein.

48.     RDLF was discriminated against by Defendants who refused to close on his purchase of Unit 1211.  N.Y.C. § 8–107[5] ).

49.     Defendant Directors individually participated in an intentional tort to deprive RDLF of the benefits of his So-Ordered sales contract with the Chapter 7 Trustee to purchase Unit 1211.

50.     Defendants' acts in refusing a lease to were intentional, arbitrary and capricious.

51.    Defendants' policies have a disparate impact on Mexican-Americans, black and Asians as there are either zero or at most 1-2 apartments, out of 154, that are presently owned by other than whites of western European ethnicities.

52.    RDLF seeks compensatory damage for the intentional infliction of emotional distress to be proven at trial but no less than $5 million; plus exemplary and punitive damages.

## Eighth Count
## Violation of New York Civil Rights Law § 19–a.

**As against all Defendants including the shareholders/proprietary lessees and residents of the Sherry identified in the caption as John Does, 1-150, Jane Does 1-150, XYZ Corp. 1-25 and ABC, Ltd. 1-25.  These designations are being employed, temporarily, as the Sherry's counsel has refused to provide the actual names that will, in any event, be learned through discovery.**

53.    RDLF repeats and re-alleges all of the relevant allegations and citations to authorities set forth in §§ I. to VII. *supra* as if fully set forth herein.

54.    So many of the Defendants who use or have used or may use the Sherry brokers to list their co-op apartments for sale or rental are liable under this statute.

55.    The Sherry brokers, headed by Nocerino, who met with RDLF in January 2017, screen out the protected classes and do not disclose information about co-op units available for sale or rent as will be demonstrated by the lack of written applications from members of protected classes.

56.    RDLF seeks a declaratory judgment that the Sherry in-house brokers cause protected classes to be subject to disparate treatment as they are not provided the same opportunity to purchase and rent co-op apartments in the Sherry thereby causing a disparate impact upon the protected classes. This is a lack of accessibility to housing that is readily available to whites of European ethnicities.

57.    RDLF seeks injunctive relief to deprive all owners of co-op apartments in the Sherry from listing their apartments for sale or rental other than with independent licensed third

party brokers who make their services available to all members of the public including protected classes.

## VIII. Certification and Closing

1.      Under Federal Rule of Civil Procedure 11, by signing below, I certify to the best of my knowledge, information, and belief that this complaint: (1) is not being presented for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; (2) is supported by existing law or by a non-frivolous argument for extending, modifying, or reversing existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Rule 11.

## IX. Relief

RDLF respectfully seeks the relief set forth at the end of each of the above eight Counts and such other and further relief, including general relief, as this Court deems just.

New York, New York
November 21, 2017

/s
Frederick Cains
Attorney for Roque De La Fuente
430 East 86th Street
New York, NY 10028
(212) 249-9920
Frederickcains@yahoo.com