USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 3/27/2018

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X

ROQUE DE LA FUENTE, an individual,

        Plaintiff,

    -v-

THE SHERRY NETHERLAND, INC., et al.,

        Defendants.

------------------------------------------------------------X

17 Civ. 4759 (PAE)

OPINION & ORDER

PAUL A. ENGELMAYER, District Judge:

  Plaintiff Roque De La Fuente brings this action alleging housing discrimination on the basis of race and ethnicity under the Fair Housing Act ("FHA"), 42 U.S.C. § 3601 *et seq.*, the Civil Rights Act of 1866, 42 U.S.C. § 1982, Title II of the Civil Rights Act of 1964, 42 U.S.C. § 2000a *et seq.*, and related provisions of New York State and City law. On November 3, 2017, the Court dismissed De La Fuente's first amended complaint without prejudice to his right to re-file. *See* Dkt. 36. On November 28, 2017, De La Fuente filed a second amended complaint. Dkt. 41 ("SAC"). Now pending is defendants' renewed motion to dismiss under Federal Rule of Civil Procedure 12(b)(6). *See* Dkt. 42.

  For the following reasons, the motion to dismiss is granted in part and denied in part. The Court dismisses De La Fuente's disparate impact and public accommodation claims, but denies the motion to dismiss his disparate treatment and other housing discrimination claims, which now proceed to discovery.

I. **Background**

   A. **Factual Background**[1]

   1. **The Parties**

De La Fuente is a Mexican-American man with a personal net worth in eight figures. SAC § V ¶¶ 1, 3.

Defendant The Sherry-Netherland ("the Sherry") is a cooperative apartment building located at 781 Fifth Avenue in Manhattan. *Id.* § VI ¶ 1. The Sherry also operates on its premises a hotel, shops, a restaurant, "Cipriani's," and a club, "Doubles." *See id.* § VI ¶ 1, § VIII ¶¶ 19–20.

The individual defendants—Howard M. Lorber, Michael J. Horvitz, Wendy Carduner, Mary McInnis Boies, Ira A. Lipman, Dr. Marjorie Fisher Furman, Frederic M. Seegal, Arnold S. Gumowitz, and Edward L. Gardner—constitute the Sherry's Board of Directors. *Id.* § II ¶ A.1. The Directors, elected by the Sherry's shareholders, control the Sherry's business and financial affairs. *Id.* § II ¶¶ 2, 6. The Directors also appoint officers of the corporation, *id.* § II ¶ 6, including Chief Operating Officer Michael Ullman, *id.* § VI ¶ 26.

   2. **The Unit Sale**

In December 2016, De La Fuente attempted to purchase a unit in the Sherry. *Id.* § V ¶ 2. Rather than purchasing with the aid of the Sherry's in-house brokers (as had most Sherry shareholders, *id.* § VI ¶ 6), De La Fuente attempted to purchase the apartment at a Chapter 7

---

[1] The Court draws these facts primarily from the SAC and accepts all factual allegations in the SAC as true, drawing all reasonable inferences in De La Fuente's favor. *See Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012). The Court also takes notice of court decisions and filings preceding this litigation. *See Pani v. Empire Blue Cross Blue Shield*, 152 F.3d 67, 75 (2d Cir. 1998) ("It is well established that a district court may rely on matters of public record in deciding a motion to dismiss under Rule 12(b)(6), including case law and statutes.").

2

bankruptcy sale, *id.* § V ¶ 2.² He was financially prepared to pay for the apartment in cash and, as he stated on the record of a December 20, 2016 sale hearing, his monthly income was more than sufficient to pay any maintenance costs. SAC § V ¶¶ 2–3.

On December 23, 2016, De La Fuente signed a bid contract and submitted the required $100,000 cash deposit to the Chapter 7 Trustee. *Id.* § V ¶ 11, § VII ¶ 12. On January 4, 2017, the Bankruptcy Court accepted De La Fuente's $1,275,000 bid as the highest and ordered both De La Fuente and the second highest bidder to undergo the Sherry's application process. *Id.* § V ¶ 12. De La Fuente timely complied by submitting his financial statements, social reference letters, private club membership details, and several magazines setting forth De La Fuente's "background as a Mexican-American real estate developer." *Id.* § V ¶ 13.

On or about January 12, 2017—before the Bankruptcy Court entered a Sale Order authorizing the Sherry to consider De La Fuente's application—the bankruptcy Trustee informed De La Fuente that the Sherry had rejected his bid. *Id.* § V ¶ 14. The Sherry never interviewed De La Fuente, *id.* § VII ¶ 17, and did not provide a written explanation of the rejection, *id.* § V ¶ 16.

Immediately after rejecting De La Fuente, the Trustee put the apartment back on the market with an asking price of $1.1 million, less than De La Fuente had bid. *Id.* § VII, ¶ 22. The defendant Directors then authorized the Sherry to purchase the unit on behalf of the Sherry itself for $990,000. *Id.* § V ¶ 21. The Trustee never returned De La Fuente's $100,000 deposit. *Id.* § VII ¶ 23.

---

² The bankruptcy case began under Chapter 11 and was converted to a Chapter 7 proceeding. *See In re Ninotchka Jannettje Manus*, S.D.N.Y. Bankr. No. 05-10338 (SCC), Dkt. 391.

3

### 3. Allegations of Discrimination

During multiple hotel stays at the Sherry in late 2016 and early 2017, De La Fuente observed only white people in the Sherry's hallways and lobby. *Id.* § VIII ¶ 23. During at least one stay, De La Fuente was denied access to the Doubles club. *Id.* § VIII ¶ 24.

At some point in early January 2017, De La Fuente met with Ullman, the Sherry's Chief Operating Officer, at Cipriani's. *Id.* § VI ¶ 26. At this meeting, Ullman "made it clear" that De La Fuente's "kind" was not welcome at the Sherry, although he stated that De La Fuente was free to stay as a hotel guest. *Id.* § VI ¶ 31.

The same month, after his application was rejected, De La Fuente spoke with Theresa Nocerino, a Sherry broker, and suggested that his daughter might purchase the apartment in his stead. *Id.* § VI ¶ 33. Nocerino responded that if De La Fuente's daughter posted a $500,000 interest-free loan, the Board might consider her more favorably than otherwise. *Id.* § VI ¶ 34. De La Fuente "subsequently learned that this requirement was not made of white ethnically west European purchasers," and that the Sherry's only Asian shareholder, Miles Kwok, had been subjected to a similar arrangement, and had later sued for discrimination. *Id.* § VI ¶¶ 37–39.

The SAC further alleges that one defendant Director, Lorber, is a long-time personal friend of President Donald J. Trump. *Id.* § VI ¶ 12. Because Lorber "at no time disavowed" then-candidate Trump's statements in June 2015 regarding Mexican immigrants, the SAC alleges, Lorber "may be deemed to agree with them." *Id.* § VI ¶¶ 16–18.

Finally, De La Fuente alleges that defendants were aware that he was Mexican-American before they rejected his application. *Id.* § VI ¶ 22. He marshals several allegations in support, including that (1) at a Bankruptcy Court hearing, De La Fuente and his son spoke Spanish in the presence of the Sherry's attorney; (2) at another Bankruptcy Court hearing, De La Fuente had

difficulty pronouncing a certain word in English in the presence of the same attorney; and (3) the word "Fuente," as in "De La Fuente," is uniquely Spanish. *Id.*

    **B.**    **Procedural History**

        **1.**    **The First Motion to Dismiss**

On June 27, 2017, De La Fuente filed his initial complaint. Dkt. 3. On August 30, 2017, he filed an amended complaint identifying as individual defendants the Sherry's Board members. Dkt. 17 ("FAC"). On September 1, 2017, defendants moved to dismiss the FAC. Dkt. 20.

On the record of a November 3, 2017 conference, the Court granted defendants' motion to dismiss the FAC. *See* Dkt. 37 ("Nov. 3 Tr."). The Court emphasized that this holding was without prejudice to De La Fuente's right to file a second amended complaint, giving De La Fuente one "last opportunity to get the pleadings right." *Id.* at 3–4.

On the merits, the Court held first that De La Fuente had adequately alleged the elements of a prima facie case of housing discrimination under the FHA, in that he had alleged that (1) he was a member of a protected class, (2) he had sought and was qualified to purchase the housing at issue, (3) he was rejected, and (4) the housing opportunity remained available to other purchasers. *Id.* at 3 (citing *Mitchell v. Shane*, 350 F.3d 39, 47 (2d Cir. 2003)). Nevertheless, the Court held, De La Fuente had failed to allege that defendants had knowledge of his racial background, as would be necessary to establish a claim of racial discrimination under the FHA. *Id.* at 4–5 (citing *Mitchell*, 350 F.3d at 48–49). The Court therefore dismissed this claim.

Second, the Court dismissed De La Fuente's claim under 42 U.S.C. § 1982. Under that section, unlike the FHA, a plaintiff must "specifically allege . . . an intent to discriminate on the basis of race by the defendant." *Id.* at 7 (quoting *Sanders v. Grenadier Realty, Inc.*, No. 08 Civ. 3920(WHP), 2009 WL 1270226, at *2 (S.D.N.Y. May 6, 2009), *aff'd* 367 F. App'x 173 (2d Cir.

5

2010)). Noting the absence of any allegations of materially similar comparators or "statements or actions indicative of racial animus," the Court held that De La Fuente had failed to allege discriminatory intent, and instead had made only "bare recitals of elements paired with legal conclusions." *Id.* at 8–10.

Third, the Court rejected De La Fuente's public accommodation claim under 42 U.S.C. § 2000a. Assuming *arguendo* that the Sherry could constitute a public accommodation by virtue of its on-premises hotel and restaurant, the Court dismissed De La Fuente's claim for failure to allege that he was denied the full and equal enjoyment of the Sherry *qua* public accommodation. *Id.* at 11–12. Because the only injury De La Fuente alleged was the rejection of his bid to buy an apartment, rather than his being denied access to the Sherry's hotel, restaurant, or club, his complaint failed to state a claim under the public accommodation laws. *Id.*

Fourth, to the extent the FAC could be construed to raise such a claim, the Court dismissed any claim premised on a disparate impact theory of liability. Such a claim would have required allegations of a "significantly adverse or disproportionate impact on persons of a particular type produced by the defendant's facially neutral acts or practices." *Id.* at 12 (quoting *Reg'l Econ. Cmty. Auction Program v. City of Middletown*, 294 F.3d 35, 52–53 (2d Cir. 2002)). De La Fuente, the Court held, had failed to allege that defendants' bid process disproportionately affected any particular group. Instead, the FAC relied upon "conclusory allegations of a 'whites-only' policy based on counsel's unelaborated-upon 'information and belief.'" *Id.* at 13 (citing *Frederick v. Wells Fargo Home Mortg.*, 649 F. App'x 29, 30 (2d Cir. 2016)).

Finally, in view of the foregoing, the Court declined to exercise supplemental jurisdiction over De La Fuente's state- and city-law claims.

6

### 2. The Second Motion to Dismiss

On November 28, 2017, De La Fuente filed the SAC. Dkt. 41. On December 5, 2017, defendants moved to dismiss the SAC. Dkt. 42. That same day, defendants filed a memorandum of law, Dkt. 44 ("Mem."), a declaration in support of their motion, Dkt. 43, and a motion for oral argument, Dkt. 46.

On December 22, 2017, De La Fuente filed his opposition to the motion to dismiss. Dkt. 47 ("Opp."). On December 27, 2017, he moved for leave to file a third amended complaint. Dkt. 48. After the parties exchanged letters on this motion, *see* Dkt. 49–50, on January 4, 2018, the Court issued an order denying leave to further amend, Dkt. 51.

On January 5, 2018, defendants filed their reply memorandum of law, Dkt. 53, as well as a second declaration in support, Dkt. 52.

On January 8, 2018, De La Fuente filed a motion for leave to file a sur-reply. Dkt. 54. On January 9, 2018, defendants filed a letter in opposition. Dkt. 55. On January 9, 2018, the Court denied the motion. Dkt. 56.

On March 19, 2018, De La Fuente filed a letter requesting a pre-motion conference and seeking leave to file a third amended complaint. Dkt. 58; *see also* Dkt. 59 ("corrected" version of same letter). The same day, defendants filed a letter in opposition, Dkt. 60, to which De La Fuente responded with another letter, Dkt. 61.

## II. Applicable Legal Standards

To survive a motion to dismiss under Rule 12(b)(6), a complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim will only have "facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the

misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A complaint is properly dismissed where, as a matter of law, "the allegations in a complaint, however true, could not raise a claim of entitlement to relief." *Twombly*, 550 U.S. at 558.

For the purpose of resolving a motion to dismiss, the Court must assume all well-pleaded facts to be true, drawing all reasonable inferences in favor of the plaintiff. *See Koch*, 699 F.3d at 145. That tenet, however, "is inapplicable to legal conclusions." *Iqbal*, 556 U.S. at 678. A pleading that offers only "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555.

## III. Discussion

Defendants move to dismiss the SAC in its entirety. The Court addresses each of De La Fuente's claims in turn.

### A. FHA Claims

A plaintiff alleging race-based discrimination under the FHA may pursue "a theory of disparate impact or one of disparate treatment." *Fair Hous. in Huntington Comm. v. Town of Huntington*, 316 F.3d 357, 366 (2d Cir. 2003) (quotation marks omitted). De La Fuente pursues both theories.

#### 1. Disparate Treatment

Count One of the SAC alleges individual housing discrimination under the FHA.[3] A plaintiff establishes a prima facie case of housing discrimination on the basis of race by showing

---

[3] Count Four also alleges "disparate treatment" under the FHA, but that Count is identical to Count One in all relevant respects save that the latter also challenges the Sherry's retention of De La Fuente's $100,000 deposit. *See* SAC § VIII ¶¶ 30–31. The Bankruptcy Court, however, has held that De La Fuente had contractually relinquished any right to return of the deposit. *See* S.D.N.Y. Bankr. No. 05-10338 (SCC), Dkt. 447 at 64–75. Accordingly, Count Four is dismissed as substantially duplicative of Count One and (to the extent not duplicative) as an improper

8

"(1) that [he is a] member[] of a protected class; (2) that [he] sought and w[as] qualified to rent or purchase the housing; (3) that [he was] rejected; and (4) that the housing opportunity remained available to other renters or purchasers." *Mitchell*, 350 F.3d at 47. As set forth on the record of the November 3, 2017 conference, De La Fuente has adequately alleged these elements for the purpose of surviving a motion to dismiss. De La Fuente alleges that he is Mexican American, SAC § III ¶ 7; that he was financially qualified to purchase the Sherry unit, *id.* § V ¶ 2; that he was rejected, *id.* § V ¶ 14; and that the unit remained on the market following his rejection, *id.* § VII ¶ 22.

Defendants have no real quarrel with the foregoing. Instead, they raise the same two arguments that they levied against the FAC: first, that De La Fuente has failed to adequately allege defendants' knowledge of his race or ethnicity, and second, that De La Fuente has failed to adequately allege defendants' discriminatory intent.

As to the first, De La Fuente has now satisfactorily filled the gap identified that the Court identified in the FAC. Whereas the FAC failed to allege that defendants knew of De La Fuente's racial or ethnic background, Nov. 3. Tr. at 5, De La Fuente's SAC now squarely alleges that "[d]efendant Directors were well aware that [he] was Mexican-American *before* rejecting his application." SAC § VI ¶ 22. This allegation is not merely conclusory: De La Fuente also alleges, *inter alia*, that one of defendants' attorneys overheard De La Fuente speaking in Spanish with his son at a hearing preceding the bankruptcy sale. *Id.* Although this allegation, like those concerning De La Fuente's distinctively Spanish surname, might be consistent with other racial or ethnic backgrounds, for the purposes of a motion to dismiss, the SAC's allegations, viewed as

---

collateral attack on the Bankruptcy Court's decision, *see AEC One Stop Grp. v. Bain Capital Fund IV L.P.*, 9 F. App'x 53, 55 (2d Cir. 2001).

9

a whole, now raise a plausible inference that defendants knew of De La Fuente's Mexican-American heritage.[4]

Defendants also argue that the SAC fails to plead facts indicative of discriminatory intent. But they again do not apply the proper law to De La Fuente's FHA claim. Disparate treatment claims under the FHA are in many respects similar to claims under other federal anti-discrimination statutes, *see Robinson v. 12 Lofts Realty, Inc.*, 610 F.2d 1032, 1038 (2d Cir. 1979), but at the pleading stage, they differ in at least one respect: "A plaintiff in stating a claim under the FHA need allege only discriminatory effect, and need not show that the decision complained of was made with discriminatory intent." *Soules v. U.S. Dep't of Hous. & Urban Dev.*, 967 F.2d 817, 822 (2d Cir. 1992) (quotation marks omitted); *accord Jones v. U.S. Dep't of Hous. & Urban Dev.*, No. 11 CV 0846 (RJD) (JMA), 2012 WL 1940845, at *3 (E.D.N.Y. May 29, 2012); *Hughes v. Lillian Goldman Family, LLC*, 153 F. Supp. 2d 435, 449–50 (S.D.N.Y. 2001).[5]

---

[4] De La Fuente also alleges that his application materials contained magazine articles describing him as Mexican-American, *id.* § V ¶ 13, but the SAC does not allege that defendants reviewed these materials.

[5] To be sure, were this case to proceed to trial, De La Fuente would need to *prove* discriminatory intent. Consistent with the *McDonnell Douglas* burden-shifting framework, he would bear the initial burden of establishing a prima facie case of such intent; proof that the housing opportunity remained open would suffice to carry this burden. *See, e.g., Broome v. Biondi*, 17 F. Supp. 2d 211, 217 (S.D.N.Y. 1997) ("In this Circuit, a housing discrimination plaintiff raises an inference of discrimination when he establishes a prima facie case."). If De La Fuente established a prima facie case, the burden would shift to defendants to articulate a legitimate, non-discriminatory reason why his application was denied. If defendants made such a showing, the burden would swing back to De La Fuente to demonstrate that the asserted reason was pretextual. At all times, however, the burden would be on De La Fuente to prove intentional discrimination. *See Hughes*, 153 F. Supp. 2d at 449–50; *see also Fair Hous. Justice Ctr. v. Edgewater Park Owners Coop.*, No. 10 CV 912 (RPP), 2012 WL 762323, at *7 (S.D.N.Y. Mar. 9, 2012).

Accordingly, the cases defendants cite to the effect that discriminatory motivation is the "*sine qua non*" of other discrimination claims are, at the pleading stage, beside the point.[6] For present purposes, it is enough that De La Fuente has plausibly alleged that he is Mexican-American, that defendants knew as much, that he was qualified, that he was rejected, and that the housing opportunity remained available.

### 2. Disparate Impact

Count Five alleges disparate impact under the FHA.[7] A plaintiff seeking relief under a disparate impact theory must allege "a significantly adverse or disproportionate impact on persons of a particular type produced by the defendant's facially neutral acts or practices." *Reg'l Econ. Cmty. Auction Program*, 294 F.3d at 52–53 (quotation marks omitted). The Court earlier rejected De La Fuente's disparate impact claim primarily on the ground that the FAC had not clearly articulated such a claim.

In the SAC, De La Fuente has added several allegations apparently directed to shoring up this claim. First, he alleges that, "[b]ased on his personal observations made during multiple stays at the Sherry in late 2016 and early 2017," "no Mexican-Americans, blacks or Asians" used the Sherry's elevators, corridors, or lobby. SAC § VIII ¶ 23. Second, he alleges that "the

---

[6] Defendants cite one decision holding that a *disability* discrimination claim under the FHA required allegations of either intentional discrimination or a failure to reasonably accommodate. *See* Mem. at 16 (citing *Spavone v. Transitional Servs. of N.Y. Supportive Hous. Program*, No. 16-CV-1219 (MKB), 2016 WL 2758269, *5 (E.D.N.Y. May 12, 2016)). That question is not presented here.

[7] Count Seven also uses the phrase "disparate impact," *see* SAC § VIII ¶ 51, but that Count seeks relief under N.Y.C. Admin. Code § 8-107(4) and (5), not (17), the NYCHRL provision applicable to disparate impact claims. *See Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.*, 715 F.3d 102, 110 n.7 (2d Cir. 2013). In any event, even if De La Fuente had alleged disparate impact under the NYCHRL, such a claim would fail for the reasons reviewed in connection with the FHA, notwithstanding the NYCHRL's more liberal construction. *See id.* at 109.

11

Mexican-American population of Sherry shareholders is zero, and there are 319,000 Mexican Americans living in New York City." *Id.* § VIII ¶ 38; *see also id.* § VIII ¶ 51 ("Defendants' policies have a disparate impact on Mexican-Americans, black[s] and Asians as there are either zero or at most 1–2 apartments, out of 154, that are presently owned by other than whites of western European ethnicities."). Third, he alleges that this disproportionate representation is attributable to "[t]he policy of the Sherry for approving applicants to purchase its apartments." *Id.* § VIII ¶ 37.

De La Fuente's observations, lacking specifics as to the experiences of other minority group applicants whom he references, are too threadbare to plausibly allege a significantly adverse or disproportionate impact on such groups. But even assuming *arguendo* that De La Fuente had adequately alleged such an effect, the SAC clearly fails to allege a facially neutral act or practice. The SAC's theory of liability is not that a neutrally applied policy (*e.g.*, a race-neutral zoning restriction) resulted in a disparate impact. Rather, the SAC alleges *intentional* discrimination on the part of the Directors. Such an allegation sounds not in disparate impact, but in disparate treatment. *See, e.g., Attard v. City of New York*, 451 F. App'x 21, 24 (2d Cir. 2011) (citing *Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 572–73 (2d Cir. 2000)).[8]

Nor can De La Fuente salvage the disparate impact claim by alleging that Sherry brokers "screen" minorities by discouraging them from applying. *See id.* § VI ¶ 8; *id.* § VIII ¶ 39. Such a practice, again, is not a "facially neutral act or practice," but an act of intentional disparate treatment. And as to such a claim, the SAC lacks non-conclusory allegations as to any other

---

[8] These cases draw on Title VII disparate impact standards, because, in the FHA context, "we use Title VII as a starting point." *Tsombanidis v. West Haven Fire Dep't*, 352 F.3d 565, 575 (2d Cir. 2003).

12

individual's experience with the Sherry's screening process. Indeed, the SAC fails to allege that De La Fuente *himself* was screened in this way. (On the contrary, it effectively pleads that he was not, insofar as De La Fuente placed his bid through the Bankruptcy Court.) Accordingly, even if another applicant might be able to formulate a challenge to the Sherry's alleged broker-screening process, such a claim would not be De La Fuente's to pursue. *See Warth v. Seldin*, 422 U.S. 490, 499 (1975) ("[T]he plaintiff generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties.").

### B. Other Housing Discrimination Claims

Counts Two, Six, Seven, and Eight raise housing discrimination claims under 42 U.S.C. § 1982, New York Executive Law § 296(5)(a)(2) ("NYSHRL"), New York City Administrative Code § 8-107(5) ("NYCHRL"), and New York Civil Rights Law § 19-a, respectively. There is authority that these claims are subject to the same analysis as the FHA disparate treatment claim addressed above. *See, e.g., Haber v. ASN 50th St. LLC*, 847 F. Supp. 2d 578, 588 & n.5 (S.D.N.Y. 2012) ("Section 1982, NYSHRL, and NYCHRL housing discrimination claims are analyzed under the same standard as claims made under the FHA."); *Sassower v. Field*, 752 F. Supp. 1182, 1188 (S.D.N.Y. 1990) (applying FHA standard to claims under the NYSHRL and New York Civil Rights Law § 19-a). To the extent the FHA's disparate-treatment analysis is applicable, the Court denies the motion to dismiss for the same reasons as reviewed above.

That said, other authorities suggest that at least as to claims arising under 42 U.S.C. § 1982, a plaintiff must "specifically allege . . . an intent to discriminate on the basis of race by the defendant." *Sanders v. Grenadier Realty, Inc.*, No. 08 Civ. 3920(WHP), 2009 WL 1270226, at *2 (S.D.N.Y. May 6, 2009) (quotation marks omitted), *aff'd* 367 F. App'x 173 (2d Cir. 2010); *see also Fair Hous. Justice Ctr.*, 2012 WL 762323, at *7 ("Unlike claims brought under the

13

FHA, section 1982 claims require a showing of discriminatory intent."). Accordingly, the Court will assume *arguendo* that De La Fuente must specifically allege discriminatory intent to survive a motion to dismiss his non-FHA housing discrimination claims.

De La Fuente has met that burden. The SAC alleges "intentional, arbitrary and malicious racial and ethnic discrimination." SAC § I ¶ 2; *accord id.* § VIII ¶ 6. And, the SAC, unlike the FAC, includes factual allegations sufficient to nudge the complaint across "the line between possibility and plausibility." *Sanders*, 367 F. App'x at 174–75 (quotation marks omitted). As noted, the SAC alleges that the apartment remained on the market after De La Fuente's rejection (indeed, at a lower price than De La Fuente had been prepared to pay). This tends to support an inference of discriminatory intent. *See Broome*, 17 F. Supp. 2d at 217. The SAC also alleges that (1) defendants knew of De La Fuente's racial and ethnic background, SAC § VI ¶ 22; (2) the Sherry's Chief Operating Officer stated in sum and substance that De La Fuente's "kind" was not welcome at the Sherry, *id.* § VI ¶ 31;[9] (3) defendants refused to allow De La Fuente to interview, as they customarily allow white applicants, *id.* § VIII ¶ 12; and (4) there are no Mexican-American shareholders in the Sherry, *id.* § VIII ¶ 16. Accepting these non-conclusory allegations as true, the SAC states a plausible claim for relief.

---

[9] Defendants note that COO Ullman, who is not a Director, is not alleged to have been a decision-maker with respect to De La Fuente's application. *See* Mem. at 13–14. Nevertheless, Ullman's high-level position (which presumably put him in close contact with the Directors), the racial overtones of the word "kind," and the fact that Ullman's remark was made to De La Fuente close in time to (and in an apparent reference to) his rejection make it fair to impute discriminatory intent to the Directors. *See Henry v. Wyeth Pharm., Inc.*, 616 F.3d 134, 149–50 (2d Cir. 2010).

### C. Public Accommodation Claims

Counts Three and Seven raise public accommodation claims under 42 U.S.C. § 2000a and NYCHRL § 8-107(4) respectively. *See id.* § VIII ¶¶ 18–28, 47–52. The two provisions are, for present purposes, materially indistinguishable. As relevant here, the former guarantees "the full and equal enjoyment of the goods, services, facilities, privileges, advantages, and accommodations of any place of public accommodation . . . without discrimination or segregation on the ground of race." 42 U.S.C. § 2000a(a). The latter makes it an "unlawful discriminatory practice" for any owner of a public accommodation to deny anyone "the full and equal enjoyment . . . of any of the accommodations, advantages, services, facilities or privileges of the place or provider of public accommodation." NYCHRL § 8-107(4)(1)(a).[10]

De La Fuente argues first that the Sherry as a whole constitutes a public accommodation because it offers public accommodations within its physical structure. *See* Opp. at 4–5, 16. But as the Court has held, the existence of alleged public accommodations within the Sherry is not germane here. *See* Nov. 3 Tr. at 11–12. De La Fuente's claim is not that he was deprived the full and equal enjoyment of such areas, but that he was denied an apartment. More specifically, he alleges that he was denied the opportunity to purchase shares of a cooperative apartment corporation, rather than the full and equal enjoyment of a public accommodation. This claim, if established, is properly remedied by the housing discrimination statutes described above.

---

[10] The NYCHRL must be construed separately from its federal counterparts in view of its "uniquely broad and remedial purposes." *Mihalik*, 715 F.3d at 109 (quotation marks omitted). In some contexts, the NYCHRL's coverage is broader. *See, e.g., Andrews v. Blick Art Materials, LLC*, 268 F. Supp. 3d 381, 400 (E.D.N.Y. 2017) (noting that NYCHRL, unlike Americans with Disabilities Act, covers "providers" of public accommodation). Here, however, De La Fuente has not pointed to any concrete statutory language (or other support for) distinguishing his NYCHRL claim from his federal claim. *See, e.g., Brooklyn Ctr. for Independence of Disabled v. Bloomberg*, 980 F. Supp. 2d 588, 643 (S.D.N.Y. 2013).

To illustrate the point, suppose that De La Fuente had wished to purchase a restaurant franchise location, but that he had been rejected on the basis of race. Although such conduct might provide the basis for a claim under other statutes, *e.g.*, 42 U.S.C. § 1981, relief would not lie under *accommodation* laws, notwithstanding that the physical space De La Fuente had sought to purchase constituted a public accommodation. Rather, a public accommodation claim would require De La Fuente to claim that he had been refused a benefit of the restaurant *qua* public accommodation (for instance, service).

The same analysis applies here. Although De La Fuente sought to become a shareholder of an entity whose physical space arguably constitutes a public accommodation, his rejection did not infringe upon his right to enjoyment of the public accommodation. On the contrary, the SAC itself alleges that De La Fuente was permitted to use at least some of the Sherry's public accommodations. *See, e.g.*, SAC § VIII ¶ 24 ("[De La Fuente] was permitted to stay as a hotel guest and to purchase meals at Cipriani's."). The Court's analysis denying this claim in the FAC thus controls here. *See* Nov. 3 Tr. at 10–12.

To be sure, the SAC now adds the factual allegation that De La Fuente was denied access to the Doubles club. *See* SAC § VIII ¶ 24. The parties dispute whether Doubles, as alleged, is a private club that falls outside public accommodations laws, *compare id.* § VIII ¶ 20, *with* Mem. at 21, but even if Doubles were so covered, De La Fuente's claim would still fail because the SAC does not allege "facts [that] demonstrate discriminatory intent" concerning his exclusion from Doubles. *See Joseph v. Met. Museum of Art*, No. 15-cv-9358 (GHW), 2016 WL 3351103, at *3 (S.D.N.Y. June 15, 2016) (quotation marks omitted). The SAC lacks allegations that defendants denied him access from Doubles specifically on the basis of his race or ethnicity. Instead, De La Fuente alleges only that access to Doubles is determined by defendant Wendy

Carduner's "arbitrary and capricious decisions as to who[m] she deigns to admit," SAC § VIII ¶ 20. De La Fuente's club-based accommodation claims therefore must be dismissed.

D. **Other Disputes Between the Parties**

For the foregoing reasons, the Court grants in part and denies in part defendants' motion to dismiss. In light of this decision, the Court denies the motion for oral argument as moot.

The Court also denies as dilatory De La Fuente's latest bid to file a third amended complaint. *See* Dkt. 51 (citing *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 200 (2d Cir. 2007)). De La Fuente first seeks leave to add Michael Ullman as a defendant, but the article he cites in support was published more than a year before the initial complaint in this matter was filed. *See* Dkt. 58-1 at 1. Plaintiff's asserted excuse for this delay—that he only recently investigated Ullman, *see* Dkt. 61—does not fly given that the SAC itself makes claims specifically about Ullman. De La Fuente second seeks to add statements from an October 2017 hearing in the Bankruptcy Court. *See* Dkt. 59 at 4. But this hearing, too, occurred well before De La Fuente filed the SAC. *See* Dkt. 41. Plaintiff's counsel represents that the transcript became available only recently, *see* Dkt. 61, but in fact the transcript was available for review at the Clerk's Office as early as October 25, 2017. *See In re Ninotchka Jannettje Manus*, S.D.N.Y. Bankr. No. 05-10338 (SCC), Dkt. 527.[11] Accordingly, the Court denies leave to amend and the associated request for a pre-motion conference.[12]

---

[11] *See also Obtaining Transcripts*, United States Bankruptcy Court for the Southern District of New York, http://www.nysb.uscourts.gov/obtaining-transcripts.

[12] These rulings do not, of course, preclude De La Fuente from pursuing discovery on matters within the scope of the SAC, including as to the circumstances surrounding his rejection, and the involvement of Ullman in that rejection.

17

Finally, the Court notes that several arguments De La Fuente makes in support of the proposed amendments raise issues that could have been—or in fact were—addressed in the parties' briefing on the motion to dismiss. The Court, however, had previously denied De La Fuente leave to file a sur-reply and admonished counsel that further submissions regarding the motion to dismiss were unwelcome. *See* Dkt. 56 at 5. Plaintiff's counsel is admonished to heed the Court's orders and is hereby notified that future disregard for such orders may give rise to viable motions by defense counsel to recover fees incurred in responding to improper submissions.

## CONCLUSION

For the above reasons, the Court dismisses De La Fuente's disparate impact and public accommodation claims, but denies the motion to dismiss his disparate treatment and other housing discrimination claims.

The Clerk of Court is respectfully directed to close the motions pending at Dkt. 42, 46, 58, 59, and 61.

The parties are directed to jointly submit by April 6, 2018 a revised Civil Case Management Plan and Scheduling Order in accordance with this Court's individual rules.

SO ORDERED.

*Paul A. Engelmayer*
Paul A. Engelmayer
United States District Judge

Dated: March 27, 2018
      New York, New York