UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:  7/30/19
```

---

ROQUE DE LA FUENTE, an individual,

                    Plaintiff,

        -v-

THE SHERRY NETHERLAND, INC., a corporation;
MICHAEL J. HORVITZ, WENDY CARDUNER,
HOWARD M. LORBER, MARY MCINNIS BOIES, IRA
A. LIPMAN, DR. MARJORIE FISHER FURMAN,
FREDERIC M. SEEGAL, ARNOLD S. GUMOWITZ,
EDWARD L. GARDNER, individuals,

                    Defendants.

---

17 Civ. 4759 (PAE)

<u>OPINION & ORDER</u>

PAUL A. ENGELMAYER, District Judge:

Plaintiff Roque De La Fuente brings housing discrimination claims against the Sherry-Netherland, Inc. (the "Sherry"), a cooperative housing corporation, and the individual members of its Board of Directors (collectively, "defendants"). Specifically, De La Fuente alleges that defendants rejected his application to purchase a cooperative apartment in the Fifth Avenue building operated by the Sherry board because he is Mexican-American. These claims arise under the Fair Housing Act ("FHA"), 42 U.S.C. § 3601 *et seq.*, the Civil Rights Act of 1866, 42 U.S.C. § 1982, New York Executive Law ("NYSHRL") § 296(5)(a)(2), New York City Administrative Code ("NYCHRL") § 8-107(5), and New York Civil Rights Law ("NYCRL") § 19-a, respectively.

De La Fuente originally brought public accommodation and housing discrimination claims under both a disparate treatment and a disparate impact theory. On November 3, 2017, in a bench ruling, the Court dismissed De La Fuente's First Amended Complaint, without prejudice to his right to file an amended complaint. Dkt. 37 ("Nov. 3, 2017 Hr'g Tr."). On November 28,

2017, De La Fuente filed a second amended complaint. Dkt. 41 ("SAC"). On March 27, 2018, the Court dismissed the disparate impact and public accommodation claims in De La Fuente's SAC but sustained the remaining claims. *See De La Fuente v. The Sherry Netherland, Inc.*, No. 17 Civ. 4759 (PAE), 2018 WL 1597649 (S.D.N.Y. Mar. 27, 2018).

Pending now are defendants' motion for summary judgment and motion to strike certain declarations filed by De La Fuente in opposition to the summary judgment motion. For the following reasons, the Court grants defendants' motion to strike in part and defendants' motion for summary judgment in its entirety.

## I.   Background

### A.   Factual Background[1]

#### 1.   The Parties

De La Fuente is a United States-born businessman of Mexican-American heritage. Def. 56.1 ¶¶ 1–2. De La Fuente states that he has a net worth in excess of $50 million. Roque Decl.

---

[1] The Court draws its account of the underlying facts from: the parties' respective submissions on the motion for summary judgment, including each party's Statement Pursuant to Local Civil Rule 56.1, *see* Dkt. 115 ("Def. 56.1"), and Dkt. 127 ("Pl. 56.1"), as well as plaintiff's counter-statement, *see* Dkt. 124 ("Pl. Counter 56.1"); the declaration of Michael J. Horvitz, Dkt. 110 ("Horvitz Decl."), in support of defendants' motion, with accompanying exhibits; and the declarations of Roque De La Fuente, Dkt. 118 ("Roque Decl."), and Frederick Cains, Esq., Dkt. 128 ("Cains Decl."), in opposition to defendants' motion, with accompanying attachments.

Citations to a party's 56.1 statement incorporate the evidentiary materials cited therein. When facts stated in a party's 56.1 statement are supported by testimonial, video, or documentary evidence and not denied by the other party, or denied by a party without citation to conflicting admissible evidence, the Court finds such facts to be true. *See* S.D.N.Y. Local Civil Rule 56.1(c) ("Each numbered paragraph in the statement of material facts set forth in the statement required to be served by the moving party will be deemed to be admitted for purposes of the motion unless specifically controverted by a correspondingly numbered paragraph in the statement required to be served by the opposing party."); *id.* Rule 56.1(d) ("Each statement by the movant or opponent . . . controverting any statement of material fact[] must be followed by citation to evidence which would be admissible, set forth as required by Fed. R. Civ. P. 56(c).").

¶ 75. De La Fuente has verbally assigned a portion of his claims in this action to Rey Olsen, who initially told De La Fuente that an apartment was available at the Sherry and who works with De La Fuente's lead counsel, Frederick Cains, Esq. Def. 56.1 ¶ 3; Def. Mem. at 3.

The Sherry is a cooperative housing corporation organized under New York law and located at 781 Fifth Avenue in Manhattan. Def. 56.1 ¶ 9. The remaining defendants—Howard M. Lorber, Michael J. Horvitz, Wendy Carduner, Mary McInnis Boies, Ira A. Lipman, Dr. Marjorie Fisher Furman, Frederic M. Seegal, Arnold S. Gumowitz, and Edward L. Gardner—are current or former members of the Sherry's Board of Directors. *Id.* ¶ 10. Michael J. Horvitz served as President of the Sherry's Board of Directors during the relevant period. *Id.* ¶ 11.

### 2.     The Application Process

A prospective shareholder of the Sherry must first enter into a sales contract with a current shareholder seeking to sell a unit. *Id.* ¶ 14. The prospective shareholder then submits a "board package," which includes, *inter alia*, "the application, a copy of the sale contract, reference letters, copies of the first pages of the applicant's two most recent federal income tax returns, [and] a financial statement." *Id.* ¶ 14. The parties dispute whether the board package also includes additional financial information about applicants. *Id.* ¶ 14.

Michael Ullman, the Sherry's Executive Vice President and Chief Operating Officer, and Susan Hennelly, a sales agent, both of whom work in the Sherry's Executive Office, review incoming board packages for completeness before sending them to Horvitz for an initial review. *Id.* ¶ 15. Upon completing his review, Horvitz, as President of the Sherry's Board, makes a recommendation whether the board should approve the application. *Id.* ¶ 16. Since becoming

President of the Board in 2013, Horvitz had recommended that the Board approve every applicant before De La Fuente. *Id.* ¶ 19.

When Horvitz recommends an applicant for approval, he conveys that recommendation to the Executive Office, which then emails the other board members to notify them of Horvitz's recommendation and distributes the applicant's board package, excluding financial information. *Id.* ¶ 17. To protect the applicant's sensitive financial information, the office holds onto a copy of that information and requires any Board members who wishes to review it to do so in person at the office. *Id.* ¶ 18. Board members typically email back their assent to continue the application process with the applicant. If the Board assents, the Board then schedules an interview of the applicant with at least two Board members. *Id.* ¶ 17.

This process, at times, involves an extra step for prospective purchasers whose primary residences and assets are located outside the United States. The Sherry requires such applicants to pay a large security deposit, which the Sherry may keep to protect its interests in the event that such a foreign shareholder were to become delinquent on his or her obligations to the Sherry. *Id.* ¶¶ 75–76. Applicants who have been subject to this requirement include Caucasian individuals from Australia, Italy, Canada, and Belgium. *Id.* ¶ 106. The Sherry does not, however, demand security deposits from foreign applicants who maintain, in its view, substantial liquid assets within the United States.[2] *Id.*

---

[2] The requirement that foreign applicants pay an additional security deposit was at the center of a previous lawsuit brought against the Sherry by a current shareholder, Miles Kwok. *Id.* ¶ 72; *see also Genever Holdings, LLC, & Miles Kwok v. The Sherry-Netherland, Inc., et al.*, No. 16 Civ. 6246 (GBD) (S.D.N.Y. 2016). Mr. Kwok, who is Chinese, brought a housing discrimination lawsuit against the Sherry, alleging that the Sherry required him to pay a $3.5 million security deposit because of his ethnicity. Def. 56.1 ¶ 72. The parties settled that lawsuit on a confidential basis and the Sherry did not admit liability. *Id.* ¶ 77.

4

### 3.     The Unit Sale at Issue

Unite 1211 at the Sherry is a 1,010 square foot one-bedroom apartment with a south view.  Horvitz Decl. Ex. B.  Ninotchka Manus, the previous owner of Unit 1211, filed for Chapter 11 bankruptcy in the United States Bankruptcy Court for the Southern District of New York.  *Id.* ¶ 23.  She became delinquent in her payment of maintenance, rent, and other financial obligations to the Sherry.  *Id.* ¶ 24.  Manus's bankruptcy case was later converted to a Chapter 7 proceeding.  *See In re Ninotchka Jannettje Manus*, S.D.N.Y. Bankr. No. 05-10338 (SCC), Dkt. 391.

The Sherry had identified a Mr. and Mrs. Falzoni as promising buyers and scheduled a December 20, 2016 court hearing to approve the contract of sale.  Pl. 56.1 ¶ 46.  Apparently without any prior notice to the Sherry or the bankruptcy trustee for Mr. Manus' estate, De La Fuente attended the hearing and announced his intention to enter a higher bid to purchase Unit 1211.  *Id.* ¶ 58.  He explained to the presiding judge that he wished to enter a higher bid to purchase Unit 1211.  *Id.* ¶ 58.  The Falzonis initially bid $1.1 million for Unit 1211; De La Fuente countered with a $1.15 million bid.  *Id.* ¶ 65.  The Falzonis then responded with a $1.25 million bid to which De La Fuente countered with a $1.275 million bid.  *Id.*  On January 4, 2017, following this exchange of bids, the Bankruptcy Court selected De La Fuente as the winning bidder.  *Id.* ¶ 67.  De La Fuente later signed a contract of sale with the trustee to purchase the unit for $1.275 million.  Def. 56.1 ¶ 26.

### a.     Background Check on De La Fuente

Upon learning of De La Fuente's interest in purchasing Unit 1211, Horvitz asked the Board's attorneys at Stroock & Stroock & Lavan LLP ("Stroock") to research De La Fuente in

the event that the Board needed to vote on his application. *Id.* ¶ 27.  Stroock provided Horvitz

with a written report of such research. *See* Horvitz Decl. ¶ 11; *id.* Ex. A ("Stroock Rpt.").

This research unearthed, *inter alia*, news articles recounting De La Fuente's failed bids

for public office.  The articles reported that, in 2016, De La Fuente attempted to run both for

president of the United States and, after failing to get the Democratic presidential nomination, for

U.S. senator from Florida, where he also owns a home. *See* Stroock Rpt. at 2.  One article

consisted of an extensive interview with De La Fuente in which he discussed his reasons for

running for president. *Id.* at 3–7.

Stroock's report to Horvitz also included a list, generated via the computer-assisted legal

research company Lexis, of approximately 60 lawsuits to which De La Fuente was either a party,

the corporate officer of a party, or a witness, or in which his name was otherwise associated. *See*

Stroock Rpt. at 11–28.  These included separate lawsuits in which De La Fuente, as the named

plaintiff, had sued California, North Carolina, Illinois, the South Carolina Democratic Party, the

Secretary of State of Georgia, and the Democratic Party of Tennessee.  Other reported cases

involved suits brought by De La Fuente against individual officers of states and against what

appeared to be private individuals or corporations, including financial institutions.  The list also

included lawsuits brought by entities which the report indicated were affiliated with De La

Fuente and/or for which he served as an officer, including D&D Landholdings, Otay Mesa

Property, L.P., International Industrial Park, Inc., Border Business Park, Inc., National

Enterprises, Inc., Otay Acquisitions, L.P., and Rancho Vista del Mar, Inc.  The report also listed

a number of cases in which De La Fuente or entities affiliated with him had been sued. *Id.*  For

each case, the report cited a brief excerpt of the reported background of the case. *Id.*

A number of the reported decisions involved litigation between De La Fuente and the Federal Deposit Insurance Corporation ("FDIC"). Two of these decisions are ones that, Horvitz attests, were particularly influential in his decision to recommend to the Board that it not approve De La Fuente's application. Def. 56.1 ¶ 31. These are *De La Fuente v. FDIC*, 332 F.3d 1208 (9th Cir. 2003) ("*DLF I*") and *De La Fuente v. FDIC*, 156 F. App'x 44 (9th Cir. 2005) ("*DLF II*"). These actions involved a challenge by De La Fuente to the FDIC's decisions to "remov[e] him as the director of First International Bank [("FIB")] and to forbid[] him from participating in, voting shares of, or serving on the board of any federally regulated bank for life." The Ninth Circuit panel stated in *DLF I* that "[t]he Board found that De La Fuente had used his position at FIB to secure several loans in excess of applicable limits for entities in which he and his close associates were interested, as well as to engage in other self interested lending practices." 332 F.3d at 1215. In evaluating the FDIC's decision, the Ninth Circuit reported in *DLF I* that "De La Fuente's actions evidenced personal dishonesty," that De La Fuente "acted untruthfully, and in violation of his fiduciary duty," and that "his conduct constitutes willful and continuing disregard for the safety and soundness of FIB." *Id.* at 1223. In *DLF II*, the Ninth Circuit ultimately upheld the FDIC's decision, finding that the "FDIC's decision to impose a permanent ban . . . was not an abuse of discretion." 156 F. App'x at 46. Horvitz attests that these reported decisions upholding the FDIC's decision to ban De La Fuente from managing any federally regulated bank suggested that De La Fuente was dishonest. Horvitz Decl. ¶ 19.

Another reported decision involved a dispute between the city of San Diego and De La Fuente which the Court notes because De La Fuente characterizes it as representative of lawsuits he has brought. Pl. 56.1 ¶ 44. The City and County of San Diego, and the federal government,

had sought to take his property in eminent domain, and De La Fuente brought suit, in his words, "to defend his property rights." *Id.*

De La Fuente does not dispute the authenticity of these news articles, or that he has brought or participated in numerous lawsuits, including the lawsuits identified in Stroock's report to Horvitz. Nor does De La Fuente dispute that Stroock reported on these matters and supplied Horvitz with these materials prior to the Board's decision. De La Fuente also does not dispute that—as reflected in the minutes of the Board's meeting rejecting his application, *see infra* p. 9—Horvitz, in recommending against his application, recited conclusions drawn from these materials, including about De La Fuente's litigiousness. De La Fuente does, however, contend that Horvitz, before receiving Stroock's report, had already negatively evaluated De La Fuente's application. Def. 56.1 ¶¶ 28–31.

On January 9, 2017, the Sherry's Executive Office received De La Fuente's board package. *Id.* ¶ 32. Having determined the board package to be complete, the Executive Office promptly turned over the application to Horvitz, who reviewed the application the same day. *Id.* ¶ 33. Among the required application materials, De La Fuente's board package included magazine articles that indicated that he is Mexican-American. *Id.* ¶¶ 35–38. Defendants do not contend that, at the time, they were unaware that De La Fuente was Mexican-American.

### b. Denial of De La Fuente's Application

Horvitz states that both De La Fuente's financial statements and his involvement in the prior lawsuits raised concerns about his application. Horvitz Decl. ¶¶ 16–19. As to the financial statements, Horvitz states that he was concerned that these had not been verified by an outside accountant or supported by brokerage statements. Def. 56.1 ¶ 41. Horvitz further states that he was concerned that De La Fuente's balance sheet and other financial records did not reflect

sufficient cash or income to pay $1,275,000 for the apartment, plus the monthly maintenance payments on Unit 1211 as well as the costs associated with De La Fuente's other residences. *Id.* ¶¶ 42–45. Horvitz did not request additional information from De La Fuente. *Id.* ¶ 46. De La Fuente disputes that there was a valid basis for concern about his finances. He notes that Steven Wendroff, an outside accountant, had prepared his financial statements and that the Sherry never requested brokerage statements from him. Pl. 56.1 ¶ 84; Pl. Counter 56.1 ¶ 41.

As to De La Fuente's litigation history, Horvitz attests that his view, at the time, was that De La Fuente's "litigious tendencies and personal dishonesty," as indicated by the Lexis searches conducted by the Sherry's attorneys, "disqualified" his application. Horvitz Decl. ¶ 18.

Horvitz states that, based on his concerns about De La Fuente's finances, litigiousness, and character, Horvitz recommended that the Board reject the application. Def. 56.1. ¶ 49. On January 10, 2017, at the regularly scheduled board meeting, the Board considered De La Fuente's board package and "additional information . . . from Stroock." Horvitz Decl. Ex. C (Board Meeting Agenda). The minutes of that meeting reflect that Horvitz recommended against approving De La Fuente's application because of his "inadequate financial submission and the litigation report" from Stroock and that, "after thorough discussion and deliberation," the Board unanimously, with the exception of one board member not present who appears not to have voted, rejected De La Fuente's application. *Id.* Ex. D ("Jan. 10, 2017 Meeting Minutes") at 3.

Sherry EVP Ullman, although present at the meeting, did not participate in the Board's deliberations on and rejection of De La Fuente's application. Def. 56.1 ¶ 55. He testified that the Board rejected De La Fuente's application without conducting a vote. Pl. 56.1 ¶ 112 (citing Dkt. 128-5 ("Ullman Dep.") at 22).

The attorney for the bankruptcy trustee responsible for Ms. Manus's bankruptcy estate thereafter informed De La Fuente that his application had been denied. Def. 56.1 ¶ 62. At the time, the Sherry did not disclose to De La Fuente the reasons for this decision. *Id.* ¶ 61.

By letter dated January 11, 2017, De La Fuente requested that the Board reconsider his application and grant him an interview. *Id.* ¶ 63. By letter dated January 12, 2017, the Board declined both requests. *Id.* ¶ 64. On January 13, 2017, De La Fuente sent an email to the Board stating that he had actually planned to purchase Unit 1211 for his daughter who planned to attend college in New York City. *Id.* ¶ 65. By letter dated January 18, 2017, Horvitz responded, stating that (1) the Board did not wish to continue the ongoing back-and-forth regarding his application, (2) De La Fuente's recent disclosure that he had sought to buy the Sherry apartment so that his daughter could use it as a residence revealed a misrepresentation in his board package insofar as the board package had stated that De La Fuente would be the only resident of the unit, and (3) De La Fuente was wrong to construe the parties' prior correspondence to mean that De La Fuente's finances were not a factor in the Board's decision not to approve his purchase. Horvitz Decl. Ex. E at 13.

The Sherry later purchased Unit 1211 for $900,000, $375,000 less than the price De La Fuente had agreed to pay for the unit. Pl. 56.1 ¶ 113 (citing Ullman Dep. at 80).

In the 10 years before De La Fuente's application was denied, Sherry EVP Ullman, who attended numerous Board meetings at which applications were discussed, recalls the Board's having rejected one other applicant. Def. 56.1 ¶¶ 22, 41. Consistent with this, the Sherry's business records reflect that, in 2010, the Board rejected an application from a tenant because research indicated that she was litigious. *Id.*

10

### c.   De La Fuente's Later Encounter with Ullman

In January 2017, De La Fuente approached Ullman while Ullman was having a drink at the bar at Harry Cipriani, a restaurant on the Sherry's ground floor. *Id.* ¶ 89.  De La Fuente introduced himself and expressed his interest in resubmitting his application and getting a Board interview. *Id.*  According to De La Fuente, Ullman told De La Fuente that he had been rejected because the Board did not want his "kind" as a shareholder.  Roque Decl. ¶ 64.  Defendants— who do not include Ullman—do not admit or deny this fact, but state that Ullman lacked authority to tell any applicant why his or her application had been rejected.  Def. 56.1 ¶ 90.

### B.   Procedural History

#### 1.   The First Motion to Dismiss

On June 27, 2017, De La Fuente filed his initial Complaint.  Dkt. 3.  On August 30, 2017, he filed an Amended Complaint adding the Sherry's Board's members as defendants.  Dkt. 17 ("FAC").  On September 1, 2017, defendants moved to dismiss the FAC.  Dkt. 20.

On the record of a November 3, 2017 conference, the Court granted that motion, without prejudice to De La Fuente's right to file a second amended complaint.  The Court gave De La Fuente one "last opportunity to get the pleadings right."  Nov. 3, 2017 Hr'g Tr. at 3–4.

On the merits, the Court held first that De La Fuente had adequately alleged the elements of a *prima facie* case of housing discrimination under the FHA, but that he had failed to allege that defendants had knowledge of his racial background, a necessary element of a racial discrimination claim under the FHA.  *Id.* at 4–5 (citing *Mitchell v. Shane*, 350 F.3d 39, 48–49 (2d Cir. 2003)).  The Court therefore dismissed that claim.

Noting the threadbare nature of the allegations in the FAC, the Court then dismissed De La Fuente's claims under 42 U.S.C. §§ 1982 and 2000a.  As to the § 1982 claims, the Court explained that, unlike the FHA, that section requires that a plaintiff to "specifically allege . . . an

intent to discriminate on the basis of race by the defendant." *Id.* at 7 (quoting *Sanders v. Grenadier Realty, Inc.*, No. 08 Civ. 3920 (WHP), 2009 WL 1270226, at *2 (S.D.N.Y. May 6, 2009), *aff'd* 367 F. App'x 173 (2d Cir. 2010)). Finding an absence of any allegations in the FAC of "statements or actions indicative of racial animus," the Court held that the FAC failed to allege discriminatory intent. *Id.* at 8–10. As to the § 2000a claims, the Court assumed *arguendo* that the Sherry could constitute a public accommodation because a hotel and restaurant operated on its premises. But, the Court found, because the only injury alleged in the FAC was that the Board had denied De La Fuente's bid to buy an apartment, rather than his being denied access to the Sherry's hotel, restaurant, or club, the FAC failed to state a public accommodation claim. *Id.* at 11–12.

The Court then dismissed any claim premised on a disparate impact theory of liability because the FAC failed to allege a "significantly adverse or disproportionate impact on persons of a particular type produced by the defendant's facially neutral acts or practices." *Id.* at 12 (quoting *Reg'l Econ. Cmty. Auction Program v. City of Middletown*, 294 F.3d 35, 52–53 (2d Cir. 2002)). The Court held that De La Fuente failed to allege that the Sherry's bid process disproportionately affected any particular group. It relied instead upon "conclusory allegations of a 'whites-only' policy based on counsel's unelaborated-upon 'information and belief.'" *Id.* at 13 (citing *Frederick v. Wells Fargo Home Mortg.*, 649 F. App'x 29, 30 (2d Cir. 2016)).

Having dismissed De La Fuente's federal claims, the Court declined to exercise supplemental jurisdiction over his state- and city-law claims. *Id.* at 14.

### 2.    The Second Motion to Dismiss

On November 28, 2017, De La Fuente filed the SAC. Dkt. 41. On December 5, 2017, defendants moved to dismiss. Dkt. 42. On March 27, 2018, after briefing, the Court granted that motion in part and denied it in part. *See De La Fuente*, 2018 WL 1597649, at *9.

The Court first noted that De La Fuente pursued FHA claims under both a disparate treatment and disparate impact theory. *Id.* at *4. The Court found that De La Fuente stated a plausible claim under the former but not the latter.

As to the former, the Court held that the SAC "satisfactorily filled the gap identified that the Court identified in the FAC" by alleging that the defendant directors were aware that he was Mexican-American before they rejected his application. *Id.* at *5. The Court also rejected defendants' argument that the SAC's claims under a disparate treatment theory were deficient for failure to plead facts indicative of discriminatory intent. The Court noted that to state a claim under the FHA a plaintiff "'need allege only discriminatory effect, and need not show that the decision complained of was made with discriminatory intent.'" *Id.* (quoting *Soules v. U.S. Dep't of Hous. & Urban Dev.*, 967 F.2d 817, 822 (2d Cir. 1992)).

As to the latter, in holding that the SAC again failed to state a FHA claim under a disparate impact theory, the Court explained that the new allegations "lack specifics as to the experiences of other minority group applicants whom he references [and] are too threadbare to plausibly allege a significantly adverse or disproportionate impact on such groups." *Id.* at *6. And, even assuming that these allegations were acceptably specific, the Court found that the SAC failed to identify any neutrally-applied policy that resulted in a disparate impact. Instead, the Court noted, the SAC alleges intentional discrimination and, therefore, "sound[ed] not in disparate impact, but in disparate treatment." *Id.*

The Court then addressed the non-FHA housing discrimination claims. The Court found the SAC's allegations adequate to state such claims to the extent premised on a disparate treatment theory of liability. *Id.* at 13. The Court assumed *arguendo* that De La Fuente was required to allege discriminatory intent and held that the SAC had done so. *Id.* at *7.

13

Finally, the Court dismissed the SAC's public accommodation claims.  The Court explained that the SAC had not pled facts plausibly alleging that he had been "refused a benefit of the restaurant *qua* public accommodation (for instance, service)." *Id.* at \*8.  De La Fuente's allegation that he had been denied the opportunity to purchase shares of the Sherry on account of his national origin did not make out a violation of 42 U.S.C. § 2000a and NYCHRL § 8-107(4). And the SAC's claim that De La Fuente had been denied access to the Doubles Club, which operates on the premises of the Sherry, failed because it did not plausibly allege that access had been denied on the basis of De La Fuente's race or ethnicity.  *Id.*

### 3.    The Motion for Summary Judgment

Discovery ensued.  On November 1, 2018, after the close of discovery, the Court held a pre-motion conference and there set a briefing schedule for summary judgment.

On November 20, 2018, defendants filed a motion for summary judgment, Dkt. 108, supporting declarations of Peter T. Shapiro, Esq., Dkt. 109 ("Shapiro Decl."), Michael J. Horvitz, Dkt. 110, Michael J. Ullman, Dkt. 111 ("Ullman Decl."), Susan Hennelly, Dkt. 112, Theresa Nocerino, Dkt. 113, with accompanying attachments; a supporting memorandum of law, Dkt. 114 ("Def. Mem."); and a Rule 56.1 Statement, Dkt. 115.

On December 13, 2018, De La Fuente filed declarations of Roque De La Fuente, Dkt. 118, Rey Olsen, Dkt. 119 ("Olsen Decl."), Paul Cohen, Esq., Dkt. 120 ("Cohen Decl."), Ricardo De La Fuente, Dkt. 121 ("Ricardo Decl."), Frederick Cains, Dkt. 122 ("Cains Decl. I"), and Steven Wendroff, Dkt. 123 ("Wendroff Decl."), with accompanying attachments, in opposition to defendants' motion.  The same day, De La Fuente filed a reply to defendants' Rule 56.1 Statement, Dkt. 124.  On December 14, 2018, De La Fuente filed an opposing memorandum of law, Dkt. 126 ("Pl. Mem."), his own Rule 56.1 Statement, Dkt. 127 ("Pl. 56.1"), and a second declaration of Frederick Cains, Dkt. 128.  On December 28, 2018, De La Fuente

14

refiled his opposition memorandum of law and attached a "notice of errata," in which he noted

misstatements in his opposition brief. Dkt. 131.

On December 28, 2018, defendants filed their reply, Dkt. 132 ("Def. Reply"), and

supporting declarations of Wendy Carduner, Dkt. 133, and a second declaration of Mr. Shapiro,

Dkt. 134 ("Shapiro Decl. II"), with accompanying attachments.

On January 4, 2019, De La Fuente sought leave to file a sur-reply. Dkt. 135. The same

day, defendants filed a letter in opposition. Dkt. 136. On January 7, 2019—without leave from

the Court—De La Fuente filed a second letter in support of his motion to file a sur-reply.

Dkt. 137. On January 9, 2019, the Court denied that motion. Dkt. 138.

## II.   Legal Standards Governing Motions for Summary Judgment

To prevail on a motion for summary judgment, the movant must "show[] that there is no

genuine dispute as to any material fact and the movant is entitled to judgment as a matter of

law." Fed. R. Civ. P. 56(a). The movant bears the burden of demonstrating the absence of a

question of material fact. In making this determination, the Court must view all facts "in the

light most favorable" to the non-moving party. *Holcomb v. Iona Coll.*, 521 F.3d 130, 132 (2d

Cir. 2008); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

If the movant meets its burden, "the nonmoving party must come forward with

admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary

judgment." *Jaramillo v. Weyerhaeuser Co.*, 536 F.3d 140, 145 (2d Cir. 2008). "[A] party may

not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion

for summary judgment." *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (internal quotation

marks and citation omitted). Rather, the opposing party must establish a genuine issue of fact by

"citing to particular parts of materials in the record." Fed. R. Civ. P. 56(c)(1)(A); *see also Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009).

"Only disputes over facts that might affect the outcome of the suit under the governing law" will preclude a grant of summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In determining whether there are genuine issues of material fact, the Court is "required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." *Johnson v. Killian*, 680 F.3d 234, 236 (2d Cir. 2012).

### III.   Discussion

The Court first addresses defendants' motion to strike (1) portions of the Cohen and Ricardo Declarations to the extent that they purport to offer expert testimony about fair housing law and ethnicity; and (2) the Wendroff Declaration because De La Fuente never identified Wendroff as a fact witness. Def. Reply at 10. The Court then evaluates defendants' motion for summary judgment.

#### A.   Defendants' Motion to Strike

At the November 1, 2018 pre-motion conference, the Court discussed with counsel the deadline for expert discovery. Plaintiff stated that expert reports had not yet been exchanged or expert depositions taken. Nov. 1, 2018 Hr'g Tr. at 18–19. The Court noted, on its review of the case management plan as reflected in the electronic docket of the case, that the deadline for expert discovery had lapsed six weeks earlier, September 22, 2018 (*i.e.*, 165 days after the issuance of the April 10, 2018 case management plan). *Id.* at 32. The Court reserved ruling on whether some intervening order had operated to extend that deadline, and invited counsel to confer on that point. *Id.* at 33. The Court explained that, if the deadline had passed, the Court

16

would not authorize post-deadline expert discovery. *Id.* at 31, 33. Counsel did not identify for the Court any order extending the expert discovery deadline beyond September 22, 2019. The parties were thus clearly precluded from filing expert reports in connection with the summary judgment motion.

Notwithstanding the case management plan and the Court's clear ruling of November 1, 2018 enforcing the expert discovery deadline set in that plan, De La Fuente, in opposing the motion for summary judgment, has submitted declarations from Paul Cohen and Ricardo De La Fuente. These submissions blatantly seek to circumvent this deadline. Cohen is not a fact witness, nor does he purport to offer testimony as such. His declaration instead sets out Cohen's insights on fair housing law based on his experience as a lawyer. Cohen Decl. ¶ 3. Cohen opines that typically a cooperative board would not evaluate an applicant's board package until it is complete and that deviation from that standard practice "most likely [occurs] when the board is looking for a reason to justify their denial of an applicant that they want to deny for improper reasons, such as discrimination." *Id.* ¶ 11. Cohen further opines that, in his professional opinion, the three reasons offered by Horvitz for denying De La Fuente's application were pretexts for discrimination. *Id.* ¶¶ 14–15.

Ricardo De La Fuente's declaration contains both factual and expert components. Ricardo is plaintiff De La Fuente's son. He attests that he accompanied his father to Bankruptcy Court on December 16, 2016, when his father informed that court of his intention to submit a higher bid on Unit 1211. Ricardo Decl. ¶ 3. He attests that he overheard the Sherry's attorney attempting to convince the Trustee to bar De La Fuente from participating in the bidding. *Id.* ¶ 9. He also states that on one occasion he was denied access to the Double Club at the Sherry and

was told that he was no longer welcome. *Id.* ¶ 20. This testimony is that of a lay fact witness. Its submission now does not breach the expert-discovery deadline.

The balance of Ricardo's declaration, however, which purports to provide a "linguistic analysis" of the names of various shareholders of the Sherry, *id.* ¶ 12, is clearly precluded as untimely expert testimony. Ricardo claims to "have abilities in 12 different languages including English, Spanish and Portuguese." *Id.* ¶ 2. Based on this purported expertise, Ricardo reviews the last names of Sherry shareholders whom defendants assert are Hispanic or Latino. He opines that each of those individuals must actually be of western European ancestry. *Id.* ¶¶ 13–14.

Even assuming *arguendo* that these declarations otherwise contained proper expert testimony, De La Fuente's unexcused non-compliance with the Court's scheduling order would clearly require exclusion of the expert testimony in such reports. *See, e.g.*, *Lava Trading, Inc. v. Hartford Fire Ins. Co.*, No. 03 Civ. 7037 (PKC), 2005 WL 4684238, at *8 (S.D.N.Y. Apr. 11, 2005) ("[U]ntimely produced evidentiary materials, including expert submissions, are subject to near automatic exclusion." (internal quotation marks and citation omitted)); *Lopez v. Louoro*, No. 01 Civ. 2490 (JSM) (DF), 2002 WL 31682398, at *3 (S.D.N.Y. Nov. 27, 2002) (excluding vocational expert report as untimely for failure to comply with court's scheduling order); *Wills v. Amerada Hess Corp.*, No. 98 Civ. 7126 (RPP), 2002 WL 140542, at *3 (S.D.N.Y. Jan. 31, 2002) (noting that the court had previously excluded two expert reports as untimely); *R.C.M. Executive Gallery Corp. v. Rols Capital Co.*, No. 93 Civ. 8571, 1996 WL 30457, at *2 (S.D.N.Y. Jan. 25, 1996) (denying plaintiffs' motion to identify expert witnesses after the court-imposed deadline and explaining that "defendants are prejudiced if they are unable to rely on [such] deadlines"). For this reason, the Court strikes the Cohen Declaration in its entirety and the portion of Ricardo

de La Fuente's Declaration that contains a "linguistic analysis" of the last names of Sherry shareholders.

In any event, independent of their untimeless, these reports are facially deficient. For expert testimony to be admissible, the district court must first determine that the expert is qualified to opine in the areas in question and that the area of testimony is a suitable one for expert testimony. *See In re Mirena IUD Prod. Liab. Litig.*, 169 F. Supp. 3d 396, 412 (S.D.N.Y. 2016); *Beastie Boys v. Monster Energy Co.*, 983 F. Supp. 2d 354, 362 (S.D.N.Y. 2014); *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 597 (1993). De La Fuente has not made a showing that Cohen is qualified to opine as an expert on FHA law—a legal matter on which, in any event, there is no occasion for expert testimony. *See, e.g.*, *Red Rock Commodities, Ltd. v. Standard Chartered Bank*, 140 F.3d 420, 424 (2d Cir. 1998) (finding expert legal testimony superfluous and unnecessary given the special legal knowledge of the court); *Hygh v. Jacobs*, 961 F.2d 359, 364 (2d Cir. 1992) ("Whereas an expert may be uniquely qualified by experience to assist the trier of fact, he is not qualified to compete with the judge in the function of instructing the jury."); *Keeling v. New Rock Theater Productions, LLC*, No. 10 Civ 9345, 2012 WL 5974009, at *1 (S.D.N.Y. Nov. 29, 2012). Nor has De La Fuente offered facts that would qualify his son, Ricardo, by training, education, or experience, to opine on the nationalities, ethnic origins, or backgrounds of the Sherry's shareholders, as derived from their surnames. And even if Ricardo were qualified to opine on that topic, such testimony is clearly irrelevant here. To the extent the nationalities of these persons may be germane at all to De La Fuente's claims of discrimination, the onus was on De La Fuente to develop the facts based on reliable evidence keyed to these individuals (e.g., by deposition testimony of them), not by inferences that may be drawn from surnames. *See Lidle ex rel. Lidle v. Cirrus Design Corp.*, No. 08 Civ. 1253 (BSJ) (HBP), 2010

WL 2674584, at *4 (S.D.N.Y. July 6, 2010) ("In order to be relevant, expert testimony should not merely reiterate arguments based on inferences that can be drawn by laypersons." (internal citations and alterations omitted)); *Ridge Clearing & Outsourcing Solutions, Inc. v. Khashoggi*, No. 07 Civ. 6611 (RJH), 2011 WL 3586468, at *2 (S.D.N.Y. Aug. 12, 2011) ("Simply rehashing evidence about which an expert has no personal knowledge is impermissible under Rule 702."); *DiBella v. Hopkins*, 403 F.3d 102, 121 (2d Cir. 2005) ("Expert testimony must be helpful to the jury in comprehending and deciding issues beyond the understanding of a layperson.").

For these separate reasons, the Court will strike the purported expert opinions contained in the Cohen and Ricardo declarations and disregard them when considering defendants' motion for summary judgment.

Defendants separately move to strike the declaration of Steven Wendroff because De La Fuente failed to include Wendroff in his Rule 26(a) disclosure. Def. Reply at 10. Wendroff's declaration explains the circumstances through which Wendroff, a certified public accountant, came to prepare the financial statement that De La Fuente submitted to Horvitz. It states his view as to whether De La Fuente's assets were sufficient to afford to purchase and pay the maintenance on Unit 1211.

The decision to strike a declaration for failure to comply with Rule 26(a) is a "harsh sanction." *Cedar Petrochems., Inc. v. Dongbu Hannong Chem. Co.*, 769 F. Supp. 2d 269, 278 (S.D.N.Y. 2011). Nonetheless, as the Second Circuit has explained, the decision to preclude such evidence lies within the discretion of the trial court, even if "the trial court finds that there is no substantial justification and the failure to disclose is not harmless." *Design Strategy, Inc. v. Davis*, 469 F.3d 284, 297 (2d Cir. 2006) (internal quotation marks and citation omitted).

Applying these standards to the Wendroff Declaration, the Court will consider that declaration on the motion for summary judgment for the limited purposes of authenticating, and explaining the information included in, De La Fuente's financial statements as De La Fuente provided these to the Sherry's Board.  The Court does not perceive prejudice in permitting this testimony, which is within the scope of Wendroff's knowledge and which is of a limited and largely non-substantive nature.  Otherwise, however, the Court will strike Wendroff's testimony.  In particular, to the extent that the Wendroff Declaration includes opinions as to his assessment, based on his experience as a certified public accountant, of the Board's decisionmaking process (e.g., whether Horvitz should have contacted him for more information about De La Fuente's financial status), the Court will disregard those statements.  As with Cohen and Ricardo, De La Fuente did not give timely notice of his intent to call Wendroff as an expert.  De La Fuente instead first identified Wendroff as a potential witness during the summary judgment process, well after the deadlines for fact, and expert, testimony had passed.  In any event, Wendroff blatantly fails to qualify as an expert on proper board governance.  His proffered testimony on these points has no proper place at this trial.

Accordingly, the Court grants defendants' motion to strike in its entirety with respect to the testimony of Cohen, and in part as to the testimony of Ricardo De La Fuente and Wendroff.

## B.    Fair Housing Act

### 1.    Legal Standards Governing De La Fuente's FHA and Other Claims

The FHA, enacted as part of Title VII of the Civil Rights Act of 1968, makes it unlawful for private actors in the housing market to "refuse to sell or rent after the making of a bona fide offer, or to refuse to negotiate for the sale or rental of, or otherwise make unavailable or deny, a dwelling to any person because of race."  42 U.S.C. § 3604(a).  In addition, § 3604(b) prohibits "discriminat[ion] against any person in the terms, conditions, or privileges of sale or rental of a

21

dwelling, or in the provision of services or facilities in connection therewith, because of race." *Id.* at § 3604(b).

Claims under the FHA may be brought under either a disparate impact or a disparate treatment theory of liability. *See Fair Hous. in Huntingon Comm. v. Town of Huntington*, 316 F.3d 357, 366 (2d Cir. 2003). The Court's March 27, 2018 ruling on the motion to dismiss the SAC dismissed all claims premised on a disparate impact theory of liability. *De La Fuente*, 2018 WL 1597649, at *6–7.

The Court analyzes FHA disparate treatment claims under the *McDonnell Douglas* burden-shifting framework used to evaluate Title VII employment discrimination claims. *See Mitchell*, 350 F.3d at 47 (citing *Robinson v. 12 Lofts Realty, Inc.*, 610 F.2d 1032, 1038 (2d Cir. 1979)). The framework has three steps. First, a plaintiff must establish a *prima facie* case of discrimination. *Id.* (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–03 (1973)). Second, if a plaintiff makes that showing, "the burden shifts to the defendant to assert a legitimate nondiscriminatory rationale for the challenged decision." *Id.* (citation omitted). Third, if defendants proffer such a reason, "the burden shifts back to the plaintiff to demonstrate that discrimination was the real reason for the defendant's action." *Id.* (citations omitted). Summary judgment in defendants' favor "is appropriate if no reasonable jury could find that the defendant's actions were motivated by discrimination." *Id.*

In the Second Circuit, the balance of De La Fuente's housing discrimination claims are analyzed under the same standard. *See, e.g., Haber v. ASN 50th St. LLC*, 847 F. Supp. 2d 578, 588 & n.5 (S.D.N.Y. 2012) ("Section 1982, NYSHRL, and NYCHRL housing discrimination claims are analyzed under the same standard as claims made under the FHA."); *Fair Hous. Justice Ctr., Inc. v. Broadway Crescent Realty, Inc.*, No. 10 Civ. 34 (CM), 2011 WL 856095, at

22

*9 (S.D.N.Y. Mar. 9, 2011) (stating that NYSHRL and NYCHRL housing discrimination claims

are "analyzed under the same standard as claims arising from the [FHA]" (citations omitted));

*Mitchell v. Century 21 Rustic Realty,* 233 F. Supp. 2d 418, 437 (E.D.N.Y.2002) ("Housing

discrimination claims brought under §§ 1981 and 1982 are analyzed under the *McDonnell*

*Douglas* test."); *Sassower v. Field*, 752 F. Supp. 1182, 1188 (S.D.N.Y. 1990) (applying FHA

standard to claims under the NYSHRL and NYCRL § 19-a).

### 2.    Analysis

De La Fuente contends that defendants rejected his application to purchase Unit 1211

because he is Mexican-American.  Defendants argue that their decision to reject his application

had nothing to do with his national origin and that the decision was based on concerns raised by

his financial statements and on his litigious history.  Def. Mem. at 2, 7–8.  Plaintiffs contend that

these rationales are pretextual.  Defendants move for summary judgment on the grounds that De

La Fuente has failed to adduce evidence to make out a *prima facie* case or, should this later step

in the *McDonnell Douglas* framework be reached, to prove that the Board's reasons for rejecting

his application were pretextual.  The Court finds with defendants on the second ground, to wit,

that De La Fuente has failed to adduce facts on which a finder of fact could find defendants'

stated reasons for denying his application to be pretextual.  The Court addresses, in sequence, the

steps in the *McDonnell Douglas* framework.

### a.    *Prima Facie* Case

De La Fuente has adduced evidence sufficient to make out a *prima facie* case of housing

discrimination.  Under *Robinson*, a plaintiff may establish a *prima facie* case by proving that

(1) he is a member of a protected class, (2) he applied for and was qualified to purchase the

housing at issue, (3) he was rejected, and (4) the housing opportunity remained available.  610

F.2d at 1038 (citing *McDonnell Douglas Corp.*, 411 U.S. at 802).  No more need be shown: "the

*Robinson* standard requires proof of discriminatory effect only, not proof of discriminatory intent." *Sassower*, 752 F. Supp. at 1187–88 (citing *United States v. Yonkers Bd. of Educ.*, 837 F.2d 1181, 1217 (2d Cir. 1987)).

These elements are met here. De La Fuente is Mexican-American. Based on his national origin, he is a member of a protected class. *See* 42 U.S.C. § 3604(a) (making it unlawful "[t]o refuse to sell or rent after the making of a bona fide offer, or to refuse to negotiate for the sale or rental of, or otherwise make unavailable or deny, a dwelling to any person because of . . . national origin"). Defendants admit that De La Fuente's board package indicated that he is Mexican-American. Horvitz Decl. ¶ 16; Def. 56.1 ¶¶ 35–38. It is also undisputed that De La Fuente applied, was qualified for, and was denied a cooperative apartment in the Sherry, and that this was an adverse housing decision. Horvitz Decl. ¶ 23. Finally, at the time De La Fuente's application was rejected, Unit 1211 remained available and did so until the Sherry itself purchased the unit. *See* Ullman Dep. at 80.

In recognizing that these facts make out a *prima facie* case, the Court emphasizes that this determination—which requires only the limited showings above, *i.e.*, that a qualified protected-class applicant was denied a housing opportunity that thereafter remained open—does not, and should not be taken to, connote that there is affirmative evidence of discriminatory intent here on any defendant's part. There is not. On the contrary, discovery revealed a complete dearth of such evidence. The decision at issue here was made by the Sherry's Board. The records of, and testimony about, the Board's deliberations do not support a claim of discriminatory intent. More broadly, there is no evidence of, at any point, any communication, oral or written, by any board member, explicitly or implicitly, about De La Fuente's heritage, or about Mexican-Americans in general, or about any other protected group, or in any other way suggesting discriminatory intent.

24

Nor has De La Fuente adduced evidence that the Board treated differently any comparator, *i.e.*, any non-minority applicant factually akin to De La Fuente. The undisputed evidence instead is that the building's cooperative apartments are owned by diverse persons, including at least three who are from Mexico. Ullman Decl. Exs. 7, 8, 10.

Further, discovery forced De La Fuente to retract the pointed allegations of racist and nativist bias made in his Complaint. Def. Mem. at 3. Three examples suffice.

First, De La Fuente's SAC alleged that defendants "believe [that others] would take away from the aura of 'Our Crowd' that [] makes their apartments especially valuable, and even the admission of one 'undesirable' would create a sense of 'there's [sic] goes the neighborhood' leading to tens if not hundreds of millions of dollars of losses of the collective market value of the 154 apartments." SAC ¶ 5. In his deposition, however, De La Fuente admitted: "I do not know what they believe or not. . . . [I]t's common knowledge that the co-ops in New York play fast and loose of who they approve and don't approve." Shapiro Decl. Ex. C ("De La Fuente Dep.") at 90. De La Fuente has not pointed to record evidence supporting this claim.

Second, De La Fuente's SAC alleged that the Sherry's "in-house real estate brokers . . . screen applicants to allow only whites of western European ethnicities to buy or rent apartments," SAC at 4, and discourage minority prospective buyers from applying by telling them "falsely [that] there are no apartments current available or those that are open for purchase are under contract," *id.* at 11. In his deposition, however, De La Fuente admitted that he lacks a factual basis for these claims, De La Fuente Dep. at 95–103, 162, and De La Fuente has again not pointed to record evidence supporting them.

Third, De La Fuente's SAC alleged that the Sherry Board had a policy that "has kept over 95% of the Sherry apartments owned exclusively by whites of western European ethnicities."

SAC at 20.  In his deposition, however, De La Fuente again backtracked, stating that this was just his "personal observation [while] in the lobby."  De La Fuente Dep. at 168.  He admitted, too, that in making this claim, he excluded Chinese and Hispanic residents, explaining, as to the latter, that individuals of Chinese descent "would qualify not to be a minority."  *Id.* at 169.

### b.    Non-Discriminatory Basis

As to the second step in the *McDonnell Douglas* test, defendants have articulated three independent reasons why the Board, on Horvitz's recommendation, rejected De La Fuente's application.

First, defendants note Horvitz's testimony that he recommended against approving De La Fuente's application because the report prepared by the Sherry's attorneys revealed evidence, in the form of federal court decisions, of serious dishonesty on De La Fuente's part.  *See* Horvitz Decl. ¶¶ 11–12, 18–19.  As Horvitz noted, the materials that the Stroock firm furnished him indicated that the FDIC, in a decision upheld by the United States Court of Appeals for the Ninth Circuit, had found him unfit to oversee a bank and that he had been "banned from the banking industry."  *See id*; *see also DLF I*, 332 F.3d at 1223 (9th Cir. 2003) ("We agree that De La Fuente's actions evidenced personal dishonesty and/or willful or continuing disregard for the safety and soundness of FIB.").  These judicial decisions further reflected that the FDIC had found that De La Fuente had secured loans in excess of applicable amounts for himself and for entities in which he held an interest.  *See DLF I*, 332 F.3d at 1215.  This financial misconduct and the corresponding FDIC sanction supplied not only a non-discriminatory basis, but a compelling one, for Horvitz and the Board, which acted on Horvitz's recommendation, to turn away De La Fuente's application to join the Sherry as a co-op shareholder.

26

Second, defendants note Horvitz's testimony that he regarded De La Fuente as excessively litigious. This was based on the dozens of lawsuits, many initiated by De La Fuente, chronicled in Stroock's background-check dossier. *See* Stroock Rpt. at 8–45. De La Fuente does not dispute the fact of his involvement in, and initiative of, many lawsuits over a span of 30 years, or that these lawsuits spanned a wide spectrum of types of claims and counterparties. *See* Pl. Mem. at 35. De La Fuente's documented litigation history also supplied a non-discriminatory basis for the Board to deny his application.

Third, defendants note Horvitz's testimony that De La Fuente's finances "did not reflect verifiable substantial liquid assets or a high reported annual income sufficient to pay the cash purchase price and pay the maintenance and other possible apartment charges." *See* Horvitz Decl. ¶ 17. As Horvitz explained, given the properties that De La Fuente held throughout the United States and abroad and the financial demands on De La Fuente presumably associated with maintaining these properties, and given the FDIC's assessment of his dishonesty and disregard for sound lending practices in connection with a financial institution, Horvitz had had doubts about the valuations De La Fuente had attached to his assets and was concerned that De La Fuente's liquid assets might prove insufficient. *See id.* ("[T]here was nothing to verify the value of these assets, and as a result it was unclear whether Plaintiff had a substantial net worth or had unfettered access to whatever liquid assets might reside within the partnerships. It was my opinion that nothing else in the materials I reviewed demonstrated sufficiently that Plaintiff had sufficient income and liquid assets to purchase the apartment and reliably pay the apartment's monthly maintenance. I also had questions about whether the income reflected on Plaintiff's tax returns would be sufficient to enable him to pay the ongoing costs of he apartment in addition to the ongoing costs of his other residences."). To be sure, De La Fuente's accountant, Wendroff,

has submitted a declaration in this litigation elaborating on the methodology he used to make the financial statement and, as De La Fuente notes, Horvitz could have asked De La Fuente for elaboration. *See* Wendroff Decl. ¶¶ 9–16. But the data before Horvitz, reflecting as it did a complex and opaque financial profile on the part of a person with a checkered financial past, supplied an ample independent, non-discriminatory basis to turn away De La Fuente's bid to join the Sherry.

De La Fuente seeks to undermine these bases on the ground that there is no documentary proof of when Horvitz received the Stroock report—upon which Horvitz claims to have relied in evaluating De La Fuente's application—before communicating his recommendation to the Board. Pl. Mem. at 31–32. And the legal research from Lexis contained in that report, De La Fuente notes, lacks a cover sheet bearing a time stamp and otherwise does not comply with the requirements for an admissible business record. *Id.*; Pl. Counter 56.1 ¶ 28. De La Fuente implies that it is possible that the Stroock's report and the legal research embedded therein was generated and/or shared only after his application had been denied. Pl. Counter 56.1 ¶ 31.

Those arguments are frivolous. To the extent De La Fuente complains that the Lexis research report chronicling De La Fuente's litigation history is not in the form of a certified business record, that argument fails. Defendants cite—and at trial, would offer—that report as relevant to the state of mind of its recipients, Horvitz, and through him, the Board, in deciding whether to allow De La Fuente to become a co-op shareholder. It is not offered for the truth of the matters asserted therein. There was therefore no need for it to be certified as a business record of Lexis. And the documentary evidence makes clear that Horvitz had received Stroock's report, including the firm's Lexis research, by the time the Board decided on De La Fuente's application. Horvitz testified, without contradiction, to this point. *See* Horvitz Decl. ¶ 12. And

the Board's minutes from that January 10, 2017 meeting attribute the denial, *inter alia*, to "the litigation report," a clear reference to Stroock's report. *See id.* Ex. D ("Jan. 10 Meeting Minutes") at 2.  The minutes further state that "[c]opies of both [bidders'] contracts, and additional information regarding the respective purchasers, including a report provided by the Corporation's counsel, regarding litigation in which each prospective purchaser had been involved, had previously been circulated to Board members." *See id.*  De La Fuente's various suppositions—that Horvitz decided to oppose De La Fuente's application before receiving the report, that neither he nor the Board had received Stroock's report before deciding on that application, and that the Board's minutes are false in stating otherwise—are unsupported by any record evidence.  They are wholly speculative.

Accordingly, defendants have proffered a legitimate, nondiscriminatory reason—indeed, three—for their denial of De La Fuente's application.  *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143 (2000) (burden of providing a legitimate, nondiscriminatory reason "is one of production, not persuasion; it can involve no credibility assessment.").

### c.   Pretext

The Court now considers whether De La Fuente has met his burden to come forward with evidence that the justifications offered by defendants are pretextual.  On defendants' motion for summary judgment, De La Fuente must identify disputed material facts which, if resolved in his favor, would enable a factfinder to find that defendants' articulated basis for denying his application was a pretext for discriminatory action.  For the following reasons, De La Fuente has failed to meet that burden.

De La Fuente makes three arguments ostensibly showing pretext for discrimination. First, he contends that the Sherry deviated from its standard application procedure, insofar as it

used a more stringent review process for him, apparently to unearth reasons to reject him.  Pl.
Mem. at 30–33.  The deviations he claims from ordinary practice include running internet
searches on his name, Horvitz's purported failure to explain to the Board why the application
should be denied, and failing to hold a formal Board vote on his application.  *Id.*  The record
evidence does not, however, support his claim that these practices were anomalous to him.  The
record contradicts De La Fuente's claim that the Board did not conduct background searches on
other applicants; the undisputed evidence is that the Board had performed such searches on at
least two prior applicants before De La Fuente.  Shapiro Decl. II Ex. B (Horvitz Dep.) at 197;
Def. 56.1 ¶¶ 22, 41.  In any event, even if there had been no precedent for such a search, the
unusual circumstance in which De La Fuente's interest surfaced—announcing it at a bankruptcy
court hearing at which the Falzoni's bid was set to be approved—provided a legitimate basis for
inquiry, via the simple expedient of a database search, into the background of the last-minute
bidder.  Indeed, given the high cost of purchasing and maintaining an apartment at the Sherry, a
streamlined background check into an applicant along the lines of Stroock's would, under any
circumstances, have been justified.

　　*Robinson v. 12 Lofts Realty, Inc.*, 610 F.2d 1032 (2d Cir. 1979), on which De La Fuente
relies, is inapposite.  There, a defendant established a screening committee that evaluated the
plaintiff's application alone, and not that of a Caucasian applicant, and for plaintiff alone
increased the number of votes required to approve an application.  *Id.*  There is no analog here.
The record does not reflect remotely comparable deviations from the Sherry's typical procedures
for assessing applications.  In this vein, De La Fuente states that Horvitz never communicated to
the Board his reasons for not approving De La Fuente's application to the board.  Pl. Mem. at 25.
The record does not support this factual contention.  Quite the contrary, the board minutes state

that "Horvitz reported that, in accordance with the Corporation's long-standing policy for review of financial materials submitted by prospective purchasers, he had reviewed the financial materials submitted by [De La Fuente] . . . and the litigation report, among other things," and "said he could not recommend approval." Jan. 10, 2017 Meeting Minutes at 2–3. The minutes add that "after thorough discussion and deliberation, the Board unanimously determined to withhold its consent." *Id.* at 3. There is no competent evidence to support De La Fuente's claim that the Board acted on an unexplained recommendation to reject him.

Second, De La Fuente argues that his financial statements revealed that his net worth exceeded $50 million, such that any concern that he was not "ready, willing and able to pay cash for a $1.275 million" apartment were "preposterous." *Id.* at 33. De La Fuente's defense of his financial statements—Horvitz's concerns about which formed one of three distinct neutral bases the Court has found for the denial of De La Fuente's application—does not support the inference that this basis masked a pretext for anti-Mexican discrimination. Reasonable minds could presumably differ as to the assessment of De La Fuente's financial suitability to become a Sherry shareholder. But, on their face, Horvitz's stated concerns were colorable, particularly given the bankruptcy of the preceding tenant, and given De La Fuente's lifetime financial sanction from the FDIC for lending irregularities. These concerns were based on, *inter alia*, the financial obligation associated with De La Fuente's numerous other properties, and whether these might complicate De La Fuente's ability to pay the present and future costs associated with ownership of Unit 1211. De La Fuente argues that to the extent the nature of his far-flung properties and related financial circumstances were not pellucid, Horvitz could have requested additional information. Pl. Mem. at 28, 34, 37. But Horvitz's decision not to draw out the application process, particularly given the other flags regarding De La Fuente, including his striking

31

litigation history, regulatory sanctions, and adjudicated dishonesty, was facially reasonable. It does not supply a basis to infer anti-Mexican animus.

Third, De La Fuente argues that Horvitz performed a cursory review of the lawsuits in which De La Fuente had participated. He argues that a thorough review would have revealed that he prevailed in most of these lawsuits, that none involved landlord-tenant law, and that he has never been never convicted of a crime. *Id.* at 35. Horvitz's decision to rely on the information disclosed by Stroock, which included the Ninth Circuit's decision chronicling and upholding the FDIC's highly damaging assessment of him and corresponding sanction, and the sheer number of lawsuits that De La Fuente had brought, was facially reasonable. A board could reasonably view the information in hand as inherently disqualifying. The decision by the Board here not to plumb other cases in De La Fuente's long litigation history cannot, without more, be fairly read as a pretext for discrimination.

De La Fuente, finally, relies on his testimony that Sherry EVP Ullman later told him that his application had been rejected because he is not the 'kind' of person the Sherry wanted as a shareholder. Pl. Mem. at 21. The Court must credit, on summary judgment, that this statement was made, although Ullman, who was deposed, has denied making it. *See* Ullman Decl. ¶ 20. For two reasons, however, this statement does not permit an inference that the Board's stated reasons were a pretext for anti-Mexican discrimination.

First, although Ullman was present at the time of the Board's deliberations, he denied that any reference was ever made to De La Fuente's ethnicity or national origin. Ullman Decl. ¶ 20. And, not being a member of the Board, he has no basis to claim to know the thought processes of its members. Def. 56.1 ¶ 55. On the record at hand, he lacked a competent basis to assert that the Board, *sub silentio*, had acted out of anti-Mexican animus.

Second, and more important, the statement that De La Fuente attributed to Ullman is consistent with the reasons given by Horvitz for the Board's denial of De La Fuente's application.  While in other contexts the locution "your kind of person" might refer to a person's ethnicity or national origin, in the context here, the statement that the Board did not wish to admit De La Fuente's "kind of person" could easily refer to the damaging facts known, and shared with the Board, about De La Fuente, as opposed to his lineage.  The Board and Horvitz, through Stroock, were privy to De La Fuente's adjudicated dishonesty, to his regulatory bar by the FDIC, and to his litigiousness.  A board could reasonably not want as a shareholder the "kind of person" who had such a long and well-documented history of contentious and problematic behavior.  The locution attributed to Ullman could easily refer to one or all of those validly-considered characteristics of De La Fuente.  In the context of the information known to the Board, Ullman's statement cannot non-speculatively be read to bespeak anti-Mexican bias.  De La Fuente has not come forward with any other evidence, including from Ullman's deposition, that would support reading his statement as connoting anti-Mexican bias.  And that the Sherry has shareholders of Mexican origin, Def. 56.1 ¶¶ 94–96, supplies a degree of evidence to the contrary.  The statement that De La Fuente attributes to Ullman therefore would not, without more, enable a juror to disregard as pretextual the legitimate justifications given for denying De La Fuente's application.

The Court therefore grants summary judgment to defendants on De La Fuente's FHA claim.

### C.    Other Housing Discrimination Claims

Section 1982, the NYCRL, the NYSHRL, and the NYCHRL use the same standards as the FHA.  *See supra* 11–12.  Accordingly, given that the facts, even read in the context most favorable to the plaintiff, would not permit De La Fuente to prevail on his discriminatory

treatment claims under the FHA, the Court also grants defendants' motion for summary judgment on the balance of De La Fuente's claims.

## CONCLUSION

For the reasons set out above, the Court grants defendants' motion to strike in part and grants their motion for summary judgment in its entirety.  The Court respectfully directs the Clerk of Court to terminate the motion pending at Dkt. 108 and to close this case.

SO ORDERED.

*Paul A. Engelmeyer*

Paul A. Engelmayer
United States District Judge

Dated: July 30, 2019
　　　New York, New York

34